**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Blue Gold Equities LLC, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No.:  18-_____ (_____)<br><br>Joint Administration Requested |

**DECLARATION OF JOEL GETZLER PURSUANT**
**TO LOCAL BANKRUPTCY RULE 1007-4 AND IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

JOEL GETZLER, under penalties of perjury, declares:

1.      I am a consultant for Seasons Corporate LLC and certain of its subsidiaries and affiliates (collectively, the "Company" or "Debtors") in the above captioned Chapter 11 cases (the "Chapter 11 Cases") and have been acting in that capacity since August 29, 2018.  My partner, William Henrich, and I have been retained as Co-Chief Restructuring Officers for the Debtors. During the past 2 weeks, I and members of my firm have become familiar with the Debtors' finances, day-to-day operations, business affairs and books and records.  I make this declaration to the best of my knowledge and belief based upon information provided to me by members of my firm who have been reviewing the Debtors' records and by employees of the Debtors, as well as my review of certain of the Debtors' documents and records.

---

[1]   The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Blue Gold Equities LLC (7766), Central Avenue Market LLC (7961), Amsterdam Avenue Market LLC (7988), Wilmot Road Market LLC (8020), Seasons Express Inwood LLC (1703), Seasons Lakewood LLC (0295), Seasons Maryland LLC (1895), Seasons Clifton LLC (3331), Seasons Cleveland LLC (7367), Lawrence Supermarket LLC (8258), Upper West Side Supermarket LLC (8895) and Seasons Corporate LLC (2266) (collectively the "Debtors").  The mailing address for the Debtors, solely for purposes of notices and communications, is: 5 Doughty Boulevard, Inwood, NY 11096.

2.     I am over the age of 18, competent to testify, and authorized to submit this Declaration in support of the Debtors' Chapter 11 petitions and the first day pleadings described herein (the "First Day Motions").

3.     On the date hereof (the "Petition Date"), the Debtors commenced these Chapter 11 Cases by filing voluntary petitions for relief under Chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of New York (the "Court").

4.     The Debtors continue to manage and operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee, examiner or official committee of unsecured creditors has been appointed in these Chapter 11 Cases. The Debtors are not small business debtors within the meaning of Bankruptcy Code Section 101(51D).

5.     The Debtors have filed or anticipate filing the following First Day Motions:

   i.    *Debtors' Motion for Order Directing Joint Administration of Cases Pursuant to Fed. R. Bankr. P. 1015(b)* ("Joint Administration Motion");

   ii.   *Debtors' Application for an Order Appointing Omni Management Group Inc, as Claims and Noticing Agent for the Debtors Pursuant to 28 U.S.C. § 156I, 11 U.S.C. § 105(a) and E.D.N.Y. Administrative Order No. 658 Nunce Pro Tunc to the Petition Date* ("Claims Agent Application");

   iii.  *Debtors' Motion for an Order Authorizing Them to Maintain Current Cash Management System and Existing Bank Accounts for the Pendency of these Cases* ("Cash Management Motion");

   iv.   *Motion of the Debtors for Entry of an Order (i) Authorizing the Debtors to Pay Certain Prepetition Wages and Compensation and Maintain and Continue Employee Benefit Programs in the Ordinary Course and (ii) Authorizing Banks to Honor and Process Checks and Transfer Related to Such Employee Obligations* ("Wage Motion");

   v.    *Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 503(b) Requesting Authority to Pay Prepetition Sales Tax and PACA Vendor Claims* ("Tax and PACA Motion");

2

vi. *Motion for an Order: (i) Restraining and Enjoining All Utility Providers From Altering, Refusing, or Discontinuing Utility Services to the Debtors; (ii) Directing all Utility Providers to Provide Continued and Uninterrupted Utility Service to the Debtors; (iii) Approving the Debtors' Proposed Adequate Assure of Future Payment in Accordance with Section 366© of the Bankruptcy Code; and (iv) Granting Related Relief.* ("Utilities Motion");

vii. *Debtors' Emergency Motion Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364 for Interim and Final Orders authorizing Debtors (i) to Obtain Post-Petition Financing and to Grant Superpriority Liens and Claims Pursuant to 11 U.S.C. §364(c) and (d); (ii) to Utilize Cash Collateral and Grant Adequate Protection to Prepetition Secure Creditors; (iii) Modifying the Automatic Stay; (iv) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C) and (v) Granting Related Relief.* ("DIP Financing Motion");

viii. *Debtors' Motion for Orders Pursuant to Sections 105(a), 363, 365 and 503 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006: (A) (i) Establishing Bidding Procedures and Bid Protections in Connection with the Sale of Certain of the Assets of the Debtors, (ii) Approving the Form and Manner of Notices; (iii) Approving the Asset Purchase Agreement Subject to Higher and Better Offers and (iv) Setting a Sale Hearing Date; and (B) (i) Approving the Sale of Certain Assets of the Debtors Free and Clear of Liens, Claims and Encumbrances; (ii) Authorizing the Assumption and Assignment of Certain Unexpired Leases and Executory Contracts and (iii) Granting Related Relief* ("APA Motion"); and

ix. *Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to Maintain and File a Consolidated Creditor Matrix and Mailing Matix; and Authorizing the Filing of a Consolidated List of Top 30 Unsecured Creditors; (III) Authorizing the Debtors to Continue Use of their Prepetition Forms and (IV) Extending the Deadline for Debtors Filing of the Debtors' Statements and Scheduled Through Sixty Days from the Petition Date* (the "Consolidated Creditor Matrix Motion").

6.    Additionally, the Debtors anticipate filing at the outset of these Chapter 11 Cases, among other things, applications seeking authorization for the Debtors to retain certain professionals in connection with these Chapter 11 Cases and a motion to establish interim compensation procedures for such professionals.

7.      I submit this declaration pursuant to Rule 1007-4 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Eastern District of New York (the "Local Rules") and in support of the First Day Motions. Except as otherwise indicated, all facts set forth in this Declaration are based upon information supplied to me by other members of the Debtors' management and professionals, my review of the relevant documents, or my experience with, and knowledge of, the Debtors' operations and financial condition, obtained during the past few weeks. If called upon, I could and would testify to the facts set forth herein. I am authorized to submit this Declaration.

8.      This Declaration is divided into three parts. Part I of this Declaration provides background information about the Debtors, their business operations, and the circumstances surrounding the commencement of these Chapter 11 cases. Part II sets forth the relevant facts in support of each of the Debtors' First Day Motions. Annexed to this Declaration are schedules providing additional information about the Debtors, as required by Local Rule 1007-4.

**PART I**

**BACKGROUND**

**A.      THE DEBTORS' OPERATIONS AND BUSINESSES.**

9.      In August 2010, Zvi Bloom ("Bloom"), Mayer Gold ("Gold") and Blue Gold Equities LLC ("Blue Gold"), an entity that Bloom and Gold formed, entered into an agreement to acquire the business of a kosher supermarket in Queens, New York (the "Queens Store") known as Supersol operated by Supersol of Queens, whose principals were Laurence Garber ("Garber") and Norman Lampert ("Lampert"). In November 2010, Bloom and Gold entered into an agreement with other entities owned by Garber and Lampert to acquire the businesses of former "Supersol") kosher supermarkets in Lawrence, New York (the "Lawrence Store"), Manhattan (the "New York

4

Store") and Scarsdale (the "Scarsdale Store" and together with the Queens Store, the Lawrence Store and the New York Store, the "Supersol Stores").

10.    Blue Gold operated the Queens Store, Central Avenue Market LLC ("Central Avenue") was formed to operate the Lawrence Store, Wilmot Road Market LLC ("Wilmot Avenue") was formed to operate the Scarsdale Store, and Amsterdam Avenue Market LLC ("Amsterdam Avenue" and, together with Blue Gold, Central Avenue and Wilmot Avenue, the "Original Operating Entities") was formed to operate the New York Store.  Each of the stores was operated under the "Seasons" name.

11.    The lease for the Lawrence Store was acquired by Lawrence Supermarket LLC, and Central Avenue became the de facto tenant and operated the Lawrence Store.  The lease for the New York Store was obtained by Upper West Side Supermarket LLC, and Amsterdam Avenue became the de facto tenant and operated the New York Store.  Lawrence Supermarkets LLC and Upper West Side Supermarket LLC are collectively referred to as the "Lawrence and New York Tenants."

12.    In 2013, Messrs. Garber and Lampert requested that Bloom and Gold convert their obligation to pay for the purchase of the Supersol Stores into obligations to pay a "consulting fee." In or about May 2013, the Original Debtor Entities, Bloom and Gold entered into a "Consulting Agreement" with L&N Group Consulting pursuant to which the Original Debtor Entities, Bloom and Gold agreed to retain the services of Messrs. Garber and Lampert as "Consultants" and to pay them a total of $18.8 million as "consulting fees" over a period of 9 years.

13.    Over time, additional Seasons stores were opened.  Seasons Lakewood LLC ("Lakewood") was formed to operate the store in Lakewood, New Jersey (the "Lakewood Store"),

Seasons Clifton LLC ("Clifton") was formed to operate the store in Clifton, New Jersey (the "Clifton Store"), Seasons Maryland LLC ("Maryland") was formed to operate the store in Baltimore, Maryland (the "Maryland Store") and Seasons Express Inwood LLC ("Inwood") was formed to operate the store in Inwood, New York (the "Inwood Store"). In addition, following substantial delays and investment, a new Store is ready to be opened in Scarsdale once sufficient funding is in place to stock the store. Finally, Seasons Cleveland LLC ("Cleveland" and, together with Lakewood, Clifton, Maryland and Inwood, the "Additional Operating Entities") was formed to operate a store in Cleveland, Ohio (the "Cleveland Store"). However, the necessary interior improvements have not yet been made at the Cleveland Store and the opening is substantially delayed.

14.     Seasons Corporate LLC ("Corporate") is the sole member of the Original Operating Entities, the Additional Operating Entities and the Lawrence and New York Tenants (collectively, the "Operating Entities"). The primary assets of Corporate are its 100% membership interests in the Operating Entities.

15.     Each of the Seasons stores has concession agreements with various vendors who sell their product (i.e., deli, sushi, bakery, etc.) in a designated part of the store (the "Concessions"). The store pays the Concessions a percentage of receipts for their product.

16.     As of the Petition Date, the Debtors owned assets of approximately $31 million based on book value. As of the Petition Date, the Debtors had aggregate liabilities of approximately $42 million, including approximately $8.8 million owed to Bank United and approximately $8 million owed to the Consultants. The Debtors' revenue for 2018 through the Petition Date is approximately $63 million.

**B.    SECURED DEBT**.

17.    In February 2016, SKNY LLC ("SKNY" or the "Pre-Petition Secured Lender") loaned $1 million to the Operating Entities, evidenced by a promissory note and a security agreement pursuant to which the Operating Entities granted SKNY a security interest in all their assets.  In March 2018, SKNY loaned an additional $1 million to the Operating Entities and the original promissory note was replaced by an Amended and Restated Promissory Note in the amount of $2 Million. On September 5, 2018, pursuant to a Second Amended and Restated Promissory Note, SKNY made an additional $1,000,000 available to the Debtors and funded $250,794.64 for payroll and $400,000 to the Debtors to provide them with the necessary funds to retain Zeichner Ellman & Krause LLP as counsel to the Debtors, Getzler Henrich & Associates LLC ("GHA") as restructuring consultants to the Debtors (as well as retention of Joel Getzler and William Henrich as Co-Chief Restructuring Officers and other GHA employees) and Omni Management Group as Claims Agent for the Debtors.  On September 7, 2018, SKNY made an additional advance of $100,000 to the Debtors to enable the Debtors to pay insurance premiums and, thereby, avoid cancellation of insurance.

**C.    EVENTS LEADING TO THE FILING OF THE CHAPTER 11 CASES**.

18.    Within a couple of years after the store acquisitions, sales at the stores operated by the Original Operating Entities had substantially increased and the stores were profitable on an operational basis.  Excess cash flow was used to develop and open new stores and make payments to the Consultants.  Over time, however, complications and delays relating to the opening of new stores and the large payments to the Consultants began to drain cash flow.

19.     By 2015, the Company was having difficulty making the monthly payments due under the Consulting Agreement. In or around November 2017, the Consultants commenced an arbitration proceeding in a Beth Din (an arbitration panel governed by Jewish law) to recover the amounts due under the Consulting Agreement. In or around March 2018, the Beth Din issued an award (the "Award") in favor of the Consultants for $8.3 million. The Beth Din directed that it be paid by April 30, 2018. When it was not paid, the Consultants moved to confirm the Award and obtained judgment against the Original Operating Entities, Bloom and Gold (the "Judgment"). The Consultants restrained the Original Operating Entities' bank accounts at Bank United. In order to induce the Consultants to release the freeze, the Consultants were paid $600,000.

20.     In October 2016, Bank United loaned $10 Million (the "Loan") to Seasons Corporate LLC ("Corporate") and obtained a security interest in all of Corporate's assets. The Operating Entities guaranteed the Loan on an unsecured basis. Although payments on the Loan were current at the time the Judgment was issued, Bank United declared a default under the Loan, based on the Judgment, and set-off against $600,000 maintained in Central Avenue's accounts.

21.     As a result of the actions by the Consultants and Bank United, the Company's cash was dramatically reduced, rendering it unable to keep the store shelves stocked. Suppliers began to require COD payments and attempts to obtain funding to restock the Stores were unsuccessful.

22.     The Company has retained Joel Getzler and William Henrich of the firm of GHA as Co- Chief Restructuring Officers ("CRO") to assist in the development of restructuring options and negotiation of a reorganization plan, oversee and execute the process for the sale of the Debtors' assets, monitor and manage the Debtors' operations and cash flow and guide the Debtors

through the bankruptcy process, including performing the necessary bankruptcy administration requirements. Messrs. Getzler and Henrich will commence acting as Co-CRO once the Debtors' obtain D&O insurance.

23.    The Company has also arranged for Debtor-in-Possession financing (the "DIP Loan") and hopes to use the proceeds thereof to restock the stores in time for the upcoming Jewish holiday of Sukkos.  Without the DIP Loan, the Debtors would not have sufficient funding to continue operations, and would lose its employees and its leases, thereby destroying the value of their businesses.

24.    The Debtors have filed these Chapter 11 Cases to best maximize value for the benefit of all interested parties - including creditors and equity interests.

## PART II

## FIRST DAY MOTIONS

25.    Concurrently with the commencement of these Chapter 11 Cases, the Debtors have filed a number of First Day Motions to minimize the adverse effects of the Chapter 11 Cases on their businesses during the pendency of the bankruptcy. I have reviewed each of the First Day Motions and related orders (including the exhibits attached thereto) and the facts set forth therein are true and correct to the best of my knowledge, information and belief. I believe that the relief sought in each of the First Day Motions and Orders (a) is vital to enable the Debtors to make the transition to, and operate in, Chapter 11 with minimum interruption or disruption to their businesses or loss of productivity or value and (b) constitutes a critical element in returning the Debtors' businesses to profitability.

## A.    JOINT ADMINISTRATION MOTION.

26.    The Debtors seek entry of an order directing joint administration of these Chapter 11 Cases for procedural purposes only. I believe that joint administration will save time and money and avoid duplicative and potentially confusing filings by permitting counsel for all parties in interest to (a) use a single caption on the numerous documents that will be served and filed herein and (b) file the papers in one case rather than in multiple cases. I understand that joint administration will also protect parties in interest by ensuring that parties in each of the Debtors' respective Chapter 11 Cases will be apprised of the various matters before the Court in these cases.

27.    I have also been advised that rights of the respective creditors and stakeholders of each of the Debtors will not be adversely affected by joint administration of these cases inasmuch as the relief sought is purely procedural and is in no way intended to affect substantive rights.

## B.    CONSOLIDATED LIST CREDITOR MOTION.

28.    The Debtors request that the Court authorize them: (a) to prepare a consolidated list of creditors in the format or formats currently maintained in the ordinary course of business in lieu of submitting any required mailing matrix; (b) file a consolidated list of the Debtors' 30 largest unsecured creditors; and (c) mail the Notice of Commencement (as defined in the Consolidated List Creditor Motion) through Omni Management Group ("Omni")

29.    There are nine (9) operating Debtor entities involved in these Chapter 11 Cases and the Debtors estimate that most of them have over 100 creditors and, on a combined basis, they have approximately 800 creditors. Contemporaneously with the filing of the motion, the Debtors have filed an application to retain Omni as their notice and claims agent in these Chapter 11 Cases. The

Debtors believe that using Omni for this purpose will maximize administrative efficiency in these Chapter 11 Cases and reduce the administrative burdens that would otherwise fall upon this Court and the U.S. Trustee.

30.    The Debtors believe that preparing the consolidated list in the format or formats currently maintained by the Debtors in the ordinary course of business will be sufficient to permit Omni to promptly provide notices to all applicable parties. Accordingly, the Debtors believe that maintaining their lists of creditors and equity holders in electronic format rather than preparing and filing separate matrices will maximize efficiency, increase accuracy and reduce costs to the benefit of these estates.

## C.    CLAIMS AGENT APPLICATION.

31.    The Debtors request that Omni be appointed as the claims and noticing agent for the Debtors and these Chapter 11 Cases, including assuming full responsibility for the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in these Chapter 11 Cases.

32.    The Debtors have obtained and reviewed engagement proposals from three (3) other court-approved claims and noticing agents to ensure selection through a competitive process. Moreover, the Debtors submit, based on all engagement proposals obtained and reviewed, that Omni's rates are competitive and reasonable given Omni's quality of services and expertise.

## D.    CASH MANAGEMENT MOTION.

33.    Prior to the Petition Date, the Debtors employed a cash management system to efficiently collect, transfer, and disburse the funds generated by its business operations (the "Cash Management System"). Each of the Original Operating Entities currently has a checking account

at Wells Fargo Bank ("Wells Fargo") and at Bank United, and each of the Additional Operating Entities has a checking account at Bank United (collectively, the "Operating Accounts"). Proceeds of credit card sales at each of the stores are received overnight in the Operating Accounts and are swept each day into Corporate's checking account maintained at Bank United. Corporate is currently using the funds it receives from the Operating Entities to make payments to the Concessions and other critical expenses (i.e., insurance, payroll, etc.) of the Operating Entities. Each of the Operating Entities (other than Maryland) also maintains an account at a local JPMorgan Chase branch into which cash receipts are deposited (the "Local Store Accounts"). Cash receipts are currently being used to make COD payments to vendors. Because there is no JPMorgan Chase branch near the Maryland store, Maryland maintains its Local Store Account at Wells Fargo. The Operating Accounts and the Local Store Accounts have minimal or a zero balance at the end of each day.

34.    The Cash Management System facilitates the Debtors' cash forecasting and reporting and enables the Debtors to monitor and record the collection and disbursement of funds and maintain control over the administration of their bank accounts (the "Bank Accounts").

35.    Although the Debtors maintain the Bank Accounts as part of an established cash management system, it is my understanding that the U.S. Trustee Guidelines require that the Debtors, as debtors in possession, take certain actions with respect to their prepetition Bank Accounts in order for the U.S. Trustee to supervise the administration of the Debtors' Chapter 11 Cases. I have been informed that, according to the U.S. Trustee Guidelines, the requirements are designed to (i) draw a clear line of demarcation between prepetition and postpetition transactions and operations, and (ii) prevent inadvertent postpetition payment of prepetition claims. The

Debtors submit, however, that a waiver of certain requirements is warranted in these Chapter 11 Cases.

36.    Specifically, the Debtors' Accounts are maintained at Bank United, JPMorgan Chase, Bank, N.A. ("JPMorgan") and Wells Fargo Bank ("Wells Fargo"); all financially stable banking institution with FDIC insurance (up to an applicable limit, if any, per Debtor). To protect against the unauthorized payment of prepetition obligations, the Debtors represent that if they are authorized to continue to use the Bank Accounts, they will not pay, and Bank United, JPMorgan and Wells Fargo will be directed not to pay, any debts incurred before the Petition Date, other than as authorized by this Court. In the event there are funds currently in an account at a Bank other than Bank United, JPMorgan and Wells Fargo, the Debtors will direct such Bank not to pay any debts incurred before the Petition Date, other than as authorized by this Court.

37.    If the U.S. Trustee's requirements are enforced in these Chapter 11 Cases, such requirements would cause enormous disruption in the Debtors' business and would impair the Debtors' business operations during these Chapter 11 Cases to the detriment of their estates and creditors. Indeed, as explained in detail above, the Bank Accounts comprise an established cash management system that the Debtors need to maintain in order to ensure that collections and disbursements continue to occur without issue or disruption during the pending of these Chapter 11 Cases.

38.    The Debtors' Cash Management System is automated and computerized. This allows the Debtors to manage centrally all of their cash flow needs and includes the necessary accounting controls to enable the Debtors, as well as creditors and the Court, to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable.

While the Debtors' Chapter 11 Cases are pending, the Debtors will continue to maintain detailed records reflecting all transfers of funds.

39.    Accordingly, in order to avoid delays in payments to administrative creditors, to ensure as smooth a transition into Chapter 11 as possible with minimal disruption, and to aid in the Debtors' efforts to maximize the value of their estates, the Debtors seek authorization to continue with their current Cash Management System.

## E.    WAGE MOTION.

40.    The Debtors request that the Court enter an order, under sections 105(a), 363(b), as applicable, prepetition obligations to current employees, including accrued prepetition wages, salaries and other cash and non-cash compensation claims, except as otherwise set forth herein (collectively, the "Employee Claims"); (b) to honor and continue in the ordinary course of business until further notice (but not assume), certain of the Debtors' vacation, sick time and holiday time policies, workers' compensation, employee benefit plans and programs (collectively, the "Employee Benefit Obligations"), and to pay all fees and costs in connection therewith, except as otherwise set forth herein; (c) to reimburse Employees for prepetition expenses that Employees incurred on behalf of the Debtors in the ordinary course of business (the "Employee Expense Obligations"); (d) to pay all related prepetition withholdings, and payroll-related taxes associated with the Employee Claims and the Employee Benefit Obligations (the "Employee Taxes" and, together with the Employee Claims, the Employee Benefit Obligations, and the Employee Expense Obligations, collectively, the "Prepetition Employee Obligations"), all as described in detail in the Wage Motion.

41.    The Debtors believe, in the exercise of their business judgment, that relief is necessary to avoid immediate and irreparable harm to the Debtors' estates. Paying prepetition wages, employee benefits and similar items will benefit the Debtors' estates and their creditors by allowing the Debtors to maintain their operations, value as a going concern and maximize the return to creditors. Indeed, the Debtors believe that without the relief requested herein being granted, their Employees may seek alternative opportunities sooner than the liquidation is complete. Such a development would deplete the Debtors' workforce, thereby hindering the Debtors' ability to conduct an orderly wind down.

## F.    SALES TAX AND PACA CLAIMS MOTION.

42.    As of the Petition Date, the Debtors owe approximately $125,000 for sales taxes collected by the Debtors but not remitted to taxing authorities and approximately $470,000 for perishable food subject to PACA. The Sales taxes and the proceeds of food items subject to PACA are deemed trust funds and must be paid promptly. Accordingly, the Debtors seek authorization to pay the pre-petition amounts owed for Sales Taxes and PACA claims.

## G.    UTILITIES MOTION.

43.    In connection with the operation of their businesses and the management of their properties, the Debtors obtain water, gas, electricity, telephone, and similar utility products and services (collectively, the "Utility Services") from the Utility Companies covering a number of utility accounts. The Debtors request entry of an order (i) prohibiting the Debtors' utility providers (the "Utility Providers") from altering, refusing or discontinuing Utility Services on account of any prepetition amounts owed and outstanding for any Utility Services rendered, on account of the Debtors' bankruptcy filing or because of any perceived inadequacy of the Debtors' Proposed Adequate Assurance; (ii) determining that the Utility Providers have received adequate assurance of payment for future Utility Services, as provided herein; (iii) approving procedures whereby the Utility Providers may request additional or different assurances beyond that proposed herein; and (iv) determining that the Debtors are not required to provide any additional assurance beyond the assurance set forth herein.

44.    The relief sought by the Debtors is for all Utility Companies providing Utility Services to the Debtors and is not limited to those listed on the Utility Company List attached to the Order as Schedule 1.

45.     On average, prior to the Petition Date, the Debtors spent approximately $100,000 each month on account of Utility Services. This amount does not include certain utilities charges (i.e., water and sewer) that are included in the Debtors' rent payments to landlords at certain store locations who are then responsible for paying the relevant utility companies.

46.     Uninterrupted Utility Services are essential to the Debtors' business operations during the pendency of these Chapter 11 Cases, particularly during the crucial upcoming holiday sales season. Should any Utility Company alter, refuse or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted, and such disruption would jeopardize the Debtors' efforts. It is essential that the Utility Services continue uninterrupted.

## H.    DIP FINANCING MOTION.

47.     The Debtors seek authority to enter into the DIP Facility (as defined in the DIP Financing Motion) in the total amount of $5.7 million, which will provide the Debtors with access to as much as $4,000,000 during the period of 14 days after entry of the Interim DIP Order (the "Interim Advance") in accordance with the Debtors' Budget. The Debtors negotiated the DIP Documents as part of their larger discussions with the Prepetition Secured Lender and DIP Lender. The DIP Documents are a reflection of the cooperation among these parties, which is critical to the Debtors' ability to expeditiously and successfully conclude these Chapter 11 Cases.

48.     I believe that the Debtors have an immediate and critical need to obtain post-petition financing under the DIP Facility in order to enable the Debtors to immediately stock the stores and increase revenue to the point where the operations are cash-flow positive. The DIP Facility will be used to pay certain authorized pre-petition expenses, as well as post-petition expenses, including employees, landlords, third party vendors, the Concessions, utilities,

insurance companies, taxing authorities, who in the judgment of the Debtors' management, provide the essential services needed to operate, maintain and insure the Debtors' assets. In addition, the Debtors require funds to retain and pay costs of professionals, consultants and advisors who will enable the Debtors to maximize value for the Debtors' estates and their creditors. Taken together, the services provided by all of the foregoing parties and other entities are absolutely critical to the preservation of the Debtors' business and asset value.

49.     The Debtors reasonably believe that the Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the Budget. Without access to the DIP Facility the Debtors would be unable to continue operating and suffer immediate and irreparable harm and the entire bankruptcy proceedings will be jeopardized to the significant detriment of the Debtors' estates and their creditors.

50.     The Debtors require financing under the DIP Facility in order to satisfy their post-petition liquidity needs. Financing on a post-petition basis is not otherwise available without granting the DIP Lender the protections it required pursuant to the DIP Loan Documents.

51.     The DIP Lender has indicated a willingness to provide the Debtors with certain financing commitments, but solely on the terms and conditions set forth in the DIP Loan Documents and the Interim Order. After considering all of their alternatives, the Debtors have concluded, in an exercise of their sound business judgment, that the financing to be provided by the DIP Lender pursuant to the terms of the DIP Loan Documents and the Interim Order represents the best financing presently available to the Debtors. These funds will be used to operate the Debtors' businesses and maintain the Debtors' assets during the Chapter 11 case.

52.    The Debtors have negotiated the DIP Facility and the DIP Loan Documents in good faith and at arm's length with the DIP Lender and Prepetition Secured Lenders. The Debtors believe that the terms of the DIP Facility are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration. Based on the advice of counsel and other professionals, and the Debtors' own analysis, the Debtors have determined in their sound business judgment that the DIP Documents provide a greater amount of financing on more favorable terms than any other reasonably available alternative.

## I.    ASSET PURCHASE AGREEMENT.

53.    The DIP Lenders' willingness to provide the DIP Loan was contingent on the Debtors' agreement to enter into an Asset Purchase Agreement (the "APA"), pursuant to which the DIP Lender has presented a stalking horse bid to acquire certain of the Debtor's assets, free and clear of liens, claims and encumbrances, for $12 million, subject to higher and better offers.

54.    It is the Debtors' business judgment that a sale of its assets will achieve the best result for the estate and creditors.  The high liquidity needs of the Debtors make it impossible for the Debtors to reorganize their businesses.  It is only through the DIP Facility that the value of the Debtors' assets can be maintained and the DIP Facility is only available based on the APA.  The Debtors have engaged in discussions with other potential lenders, all of whom have expressed interest in a DIP Facility if it is tied to an asset sale.  Accordingly, the Debtors believe that it is in the best interest of the estate and creditors to promptly proceed with the APA, subject to higher and better offers.

J.    **MOTION FOR CONSOLIDATED MATRIX AND LIST OF 30 LARGEST CREDITORS AND TO EXTEND TIME TO FILE SCHEDULES.**

55.    The scope and complexity of the Debtors' businesses, coupled with the limited time and resources available to the Debtors to marshal the required information, necessitate an extension of the deadline to file the Schedules and SOFAs. As stated above, the Debtors have approximately 800 potential creditors and operate a regional retail business with products sourced nationwide. Further, the nature and scope of the Debtors' operations require them to maintain voluminous records.

56.    The Debtors' request that the Court grant a 60-day extension of the time to file Schedules and SOFA. I believe that an extension is necessary due to the complexity and diversity of the Debtors' business, the limited staff available to perform the required internal review of their financial records and affairs, the numerous critical operational matters that their limited accounting staff and legal personnel must address in the early days of these Chapter 11 Cases, the pressure incident to the commencement of these Chapter 11 Cases, and the fact that certain prepetition invoices may have not yet been received or entered into their accounting systems.

57.    For the same reason, the Debtors seek authorization to file a consolidated list of the thirty (30) largest creditors in lieu of the list of twenty (20) largest creditors for each Debtor. It would be impracticable for each Debtor to file a separate list. Thus, the filing of a consolidated list is in compliance with this Court's Guidelines for First Day Motions (the "Guidelines"). Similarly, the Debtors seek authorization to consolidate the Debtors' list of creditors and other parties-in-interest, identifying their creditors in substantially the same formats that are currently

maintained by the Debtors in the ordinary course of their businesses and to omit claim amounts of creditors from such list (the "Consolidated Matrix").

## PART III

## SCHEDULES PURSUANT TO LOCAL RULE 1007-4

58.     Attached hereto and incorporated herein by reference are various schedules setting forth information required pursuant to Local Bankruptcy Rule 1007-4 and the Court's Guidelines for First Day Motions (the "Guidelines"). Capitalized terms used in the attached schedules that are not otherwise defined therein shall have the meanings ascribed to them in this Declaration.

59.     Although the Debtors' records list approximately 800 total creditors, there is substantial amount of overlap (a substantial number of vendors sell to multiple stores). Thus, it is impracticable for each Debtor to file a separate list of the twenty (20) largest unsecured claims. Accordingly, pursuant to the Guidelines, attached as Schedule 2 is a list of the thirty (30) largest unsecured creditors on a consolidated basis.

\*       \*       \*

I declare under penalty of perjury that the foregoing is true and correct.

Dated:    September 16, 2018
          New York, New York

                                    Seasons Corporate LLC (for itself and on behalf of each of its subsidiary debtors)

                              By:    /s/ Joel Getzler
                                     Name: Joel Getzler
                                     Title: Consultant and Proposed Co-CRO

## EXHIBIT A

### Corporate Organizational Chart



## SCHEDULE 1[2]

## List of Committees Formed Prior to the Petition Date

Pursuant to Local rule 1007-4(a)(iv), and to the best of the Debtors' knowledge, no committees were organized prior to the Petition Date.

---

[2]    Capitalized terms used in these schedules that are not otherwise defined therein shall have the meanings ascribed to them in the First Day Declaration.

## SCHEDULE 2

### Consolidated List of 30 Largest Unsecured Creditors

Pursuant to Local Rule 1007-4(a)(v), the following provides information with respect to the holders of the 30 largest unsecured claims against the Debtors on a consolidated basis.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim listed herein in a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control. The schedule includes estimates outstanding claim amounts as of the Petition Date. The Debtors have excluded from this schedule any claims that will be addressed by the First Day Motions filed in connection with these Chapter 11 Cases. Any employees and former employees owed amounts under non-qualified pension plans or deferred compensation plans are also not included in this schedule.

|   | NAME OF CREDITOR | MAILING ADDRESS INCLUDING ZIP CODE | AMOUNT OF CLAIM |
|---|---|---|---|
| 1 | Bank United | 445 Broadhollow Road Melville, NY 11747 | 8,800,000.00 |
| 2 | L&N Consulting c/o Kasowitz Benson Torres | 1633 Broadway New York, NY 10019 | 8,000,000.00 |
| 3 | Bank Capital Services Dba FNB Equipment | 1853 Highway 315 Pittston, PA 18640 | 1,500,000.00 |
| 4 | Quality Glatt NJ Corp. | 383 Kingston Avenue Ste. 262 Brooklyn, NY 11213 | 1,355,473.87 |
| 5 | New Albertsons/ Acme Markets, Inc. | P.O. Box 956679 St. Louis, MO 63195 | 547,405.20 |

| | | | |
|---|---|---|---|
| 6 | Shloms Heimish Corp. | 5104 12 Avenue<br>Brooklyn, NY 11219 | 395,185.90 |
| 7 | Kenover Marketing Corp. | 72 New Hook Road<br>Bayonne, NJ 07002 | 343,689.14 |
| 8 | Nassau Provisions Kosher | 200 Albany Avenue<br>Freeport, NY 11520 | 318,403.25 |
| 9 | Scarsdale Shopping Center<br>Associates LLC | P.O. Box 327H<br>Scarsdale, NY 10583 | 300,000.00 |
| 10 | American Express | P.O. Box 650448<br>Dallas, TX 75265-0448 | 302,370.00 |
| 11 | Cleveland Kosher Market | 27 Shonny Court<br>Lakewood, NJ 08701 | 291,663.00 |
| 12 | Main Five Co.<br>Lewis & Murphy Realty Inc. | 47 Hillside Ave., 1st Fl.<br>Manhasset, NY 11030 | 272,757.77 |
| 13 | CEG Co. LLP | 30-30 Northern Blvd.,<br>Ste. 4<br>Long Island City, NY 11101 | 261,050.54 |
| 14 | SBP International | 701 39 Street<br>Brooklyn, NY 11232 | 252,110.97 |
| 15 | J&J Farms Creamery | 57-48 49 Street<br>Maspeth, NY 11378 | 248,191.60 |
| 16 | Third Nassau Corp. | c/o First Service<br>Residential<br>Emerson, NJ 07630 | 235,449.16 |
| 17 | Blue Sky Trading | 1556 61 Street<br>Brooklyn, NY 11219 | 208,045.72 |
| 18 | Mechis Deli Corp. | 741 East 9th Street<br>Brooklyn, NY 11230 | 205,394.85 |
| 19 | Flaum Appetizing | 288 Scholes Street<br>Brooklyn, NY 11206 | 160,002.05 |

| 20 | Raskins Fish Market | 320 Kingston Avenue Brooklyn, NY 11213 | 149,915.40 |
|----|---------------------|----------------------------------------|------------|
| 21 | Glicks | 72 New Hood Road Bayonne, NJ 07002 | 141,171.38 |
| 22 | Main Ingredient | 467 Allwood Road Clifton, NJ 07012 | 125,474.54 |
| 23 | Golden Taste | 318 Roosevelt avenue Spring Valley, NY 10977 | 112,519.70 |
| 24 | RPE LLC | 144-39 68 Road Flushing, NY 11367 | 108,262.76 |
| 25 | Main Street Bakeshop | P.O. Box 110736 Brooklyn, NY 11211 | 105,672.13 |
| 26 | Quality Frozen Foods | P. O. Box 4-0322 Brooklyn, NY 11204 | 97,612.00 |
| 27 | Lantev Distributing | 10110A Foster avenue Brooklyn, NY 11236 | 96,948.00 |
| 28 | Robert Spano Plumbing Inc | 152 Adams Street Bedford Hills, NY 10507 | 91,650.00 |
| 29 | Bagel Bites | 240 60 Street Brooklyn, NY 11220 | 90,074.44 |
| 30 | B&W Foods Inc. | 72 New Hook Inc. P.O. Box 82 Bayonne, NJ 07002 | 84,239.42 |

**Consolidated List of the Holders of the 5 Largest Secured Claims**

Pursuant to Local Rule 1007-4(a)(vi), the following lists the creditors holding, as of the Petition Date, the five largest secured, non-contingent claims against the Debtors, on a consolidated basis.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| | Creditor | Contact, Mailing Address & Telephone Number/Fax Number | Nature of Claim | Amount of Claim |
|---|---|---|---|---|
| 1. | SKNY LLC | 200 Public Square Ste. 2500 Cleveland, OH 44114 | Loan in the principal amount of $2,650,000.00 | $3,000,000.00 |
| 2. | Crestmark Equipment Finance | P.O. Box 233756 3756 Momentum Place Chicago, IL 60688 | Equipment financing | $4,687,877.00 |
| 3. | Hanmi Bank | c/o AVP Collections P.O. Box 2149 Gig Harbor, WA 98335 | Equipment financing | $   39,704.00 |

## SCHEDULE 4

### Summary of the Debtors' Assets and Liabilities

Pursuant to Local Rule 1007-4(a)(vii), the following financial data (unaudited and subject to change) is the latest available information and reflects the Debtors' financial conditions, as consolidated as of Petition Date.

The following financial data shall not constitute an admission of liability by the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a contingent, unliquidated or disputed claim or debt or challenge the priority, nature, amount or status of any claim or debt.

Total Assets (book value):    $31 million

Total Liabilities:    $42 million

## SCHEDULE 5

### Schedule of Publicly Held Securities

Pursuant to Local Rule 1007-4(a)(viii), the Debtors have no publicly held shares of stock, debentures or other securities.

## SCHEDULE 6

### List of Debtors' Property in the Possession of Third Parties

Pursuant to Local Rule 1007-4(a)(ix), none of the Debtors' property is in the possession or custody of any custodian, public officer, mortgage, pledge, assignee of rents, secured creditor, or agent for any such entity.

**Summary of Property From Which the Debtors Operate Their Business**

Pursuant to Local Rule 1007-4(a)(x), the following lists the property or premises owned, leased or held under other arrangement from which the Debtors operate their businesses.

| Debtor | Premises Description | Leased/ Owned | Premises Address |
|---|---|---|---|
| Seasons Corporate LLC | Inwood Store | Leased | 5 Doughty Boulevard Inwood, NY 11096 |
| Blue Gold Equities, LLC | Queens Store | Leased | 68-18 Main Street Flushing, NY 11367 |
| Central Avenue Market LLC | Lawrence Store | Leased | 330 Central Ave. Lawrence, NY 11559 |
| Seasons Express Inwood LLC | Inwood Store | Leased | 50 Doughty Boulevard Lawrence, NY 11559 |
| Amsterdam Avenue Market LLC | New York Store | Leased | 661 Amsterdam Ave. New York, NY 10025 |
| Wilmot Road Market LLC | Scarsdale Store | Leased | 1136 & 1104 Wilmot Road Scarsdale, NY 10583 |
| Seasons Clifton LLC | Clifton Store | Leased | 761 Allwood Road Clifton, NJ 07012 |
| Seasons Lakewood LLC | Lakewood Store | Leased | 711 Cedarbridge Avenue, Lakewood, NJ 08701 |
| Seasons Maryland LLC | Maryland Store | Leased | 1630 Reistertown Road Pikesville, MD 21208 |
| Seasons Cleveland LLC | Cleveland Store | Leased | 1930 Warrensville Center Road South Euclid, OH 44121 |
| Lawrence Supermarket LLC | Tenant of Lawrence Store | Leased | 330 Central Ave. Lawrence, NY 11559 |
| Upper West Side Supermarket LLC | Tenant of New York Store | Leased | 661 Amsterdam Ave. New York, NY 10025 |

## SCHEDULE 8

### Location of the Debtors' Assets, Books and Records

Pursuant to Local Rule 1007-4(a)(xi), the following lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location and value of any assets held by the Debtors outside the territorial limits of the United States.

### Location of Debtors' Substantial Assets

The Debtors have substantial assets at its stores located in New York, New Jersey, Maryland and Ohio.

### Books and Records

The Debtors' books and records are located at 5 Doughty Boulevard, Inwood, NY 11096.

### Debtors' Assets Outside the United States (if applicable)

The Debtors do not have assets outside of the United States.

**SCHEDULE 9**

**Summary of Legal Actions Against the Debtors**

Pursuant to Local Rule 1007-4(a)(xii), the following is a list of the nature and present status of each material action or proceeding, pending or threatened, against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent.

| Action or Proceeding | Date Filed | Nature of Action | Case Number and Court | State of Acton |
|---|---|---|---|---|
| Scarsdale Shopping Center Associates v. Wilmot Road Market LLC | | L&T eviction | Westchester County | Pending |
| Main Properties DM LLC and Main Properties AM LLC v. Blue Gold Equities Inc. | | L&T eviction | Civil Court, Queens County | 3 Day Notice |
| Third Nassau Corp. v Lawrence Supermarket LLC | | L&T eviction | Nassau County | 5 Day Notice |
| 319 Cedarbridge LLC v. Seasons Lakewood LLC | | L&T eviction | Superior Court, Ocean County | Pending |
| The CEG Company v. Upper West Side Supermarket LLC | | L&T eviction | L&T Index No. 071071/2018<br><br>Civil Court, New York County | Pending |
| Office MD-1, LLC v. Seasons Maryland, LLC | | L&T eviction | L&T Index No. SPO3410-18<br><br>District Court, Baltimore County | Pending |

| | | | | |
|---|---|---|---|---|
| Imperial Bag & Paper Co., LLC v Amsterdam Ave. Market LLC | | Collection | L&T Index No. 035091, Supreme Court, Rockland County | Pending |

## SCHEDULE 10

### Senior Management

Pursuant to Local Rule 1007-4(a)(xiii), the following provides the names of the individuals who comprise the Debtors' existing senior management, a description of their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

| Name/Position | Experience and Responsibilities |
|---|---|
| Joel Getzler | Joel Getzler has 25 years of experience in restructuring and has been Co-Chairman of Getzler Henrich for 15 years. Additionally, he has been an investor and a merchant banker. He has also served in CRO and interim roles. |
| William Henrich | William Henrich has 36 years of experience in restructuring and has been co-chairman of Getzler Henrich for 15 years. He has served as CRO numerous times, both in and out of Court. |
| Mayer Gold, Vice-President | Mr. Gold has served as Vice President since 2010. Before joining Debtors team Mr. Gold served as construction consultant to and General Manager of Pomegranate Supermarket in Brooklyn, NY. Prior to that Mr. Gold was the General Manager of Supersol Supermarket in Flushing, NY for twelve years. |

## SCHEDULE 11

### Payroll

Pursuant to Local Rule 1007-4(a)(xiv), the following provides the estimated amount of weekly payroll to be paid to the Debtors' employees (exclusive of officers, directors, stockholders, partners and members) for the 30-day period following the filing of the Chapter 11 petitions.

| Payments to Employees | |
|---|---|
| Payments to Employees (Not Including Officers and Directors) | $244,000 (weekly) |

## SCHEDULE 12

### Payments to Officers and Consultant

Pursuant to Local Rule 1007-4(a)(xv), the following provides the estimated amount to be paid to the Debtors' officers and consultant for the 30-day period following the filing of the Chapter 11 petitions.

| Payments to Officers and Consultant | |
| --- | --- |
| Payments to Officers | $38,000 |
| Payments to Getzler Henrich & Associates LLC | $212,000 |

# SCHEDULE 13

## Cash Receipts and Disbursements,
## Net Cash Gain or Loss, Unpaid Obligations and Receivables

Pursuant to Local Rule 1007-4(a)(xvi), the following provides, for the 30-day period following the Petition Date, the estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remaining unpaid, other than professional fees, on a consolidated basis.

| | |
|---|---:|
| Cash Receipts | $4,148,475 |
| Cash Disbursements | $9,322,150 |
| Net Cash Gain (Loss) | $5,173,675 |
| Unpaid Obligations | $462,164 |
| Unpaid Receivables | $150,000 |