Nathan Schwed, Esq.
Peter Janovsky, Esq.
Robert Guttmann, Esq.
ZEICHNER ELLMAN & KRAUSE LLP
1211 Avenue of the Americas
New York, New York 10036
Telephone:(212) 223-0400
Facsimile: (212) 753-0396

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Blue Gold Equities LLC, *et al.*, | Case No.:  18-_____ (___) |
| Debtors.[1] | Joint Administration Requested |

**DEBTORS' EMERGENCY MOTION PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363
AND 364 FOR INTERIM AND FINAL ORDERS AUTHORIZING DEBTORS (I) TO
OBTAIN POST-PETITION FINANCING AND TO GRANT SUPERPRIORITY LIENS
AND CLAIMS PURSUANT TO 11 U.S.C. § 364(c) AND (d); (II) TO UTILIZE CASH
COLLATERAL AND GRANT ADEQUATE PROTECTION TO PREPETITION
SECURED CREDITORS; (III) MODIFYING THE AUTOMATIC STAY; (IV)
SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b)
AND (c); AND (V) GRANTING RELATED RELIEF**

Blue Gold Equities, LLC ("Blue Gold"), Central Ave. Market LLC ("Central Avenue"),

Amsterdam Ave. Market LLC ("Amsterdam Avenue"), Wilmot Road Market, LLC ("Wilmot

Road"), Seasons Express Inwood LLC ("Inwood"), Seasons Lakewood, LLC ("Seasons

---

[1]   The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Blue Gold Equities LLC (7766), Central Avenue Market LLC (7961), Amsterdam Avenue Market LLC (7988), Wilmot Road Market LLC (8020), Seasons Express Inwood LLC (1703), Seasons Lakewood LLC (0295), Seasons Maryland LLC (1895), Seasons Clifton LLC (3331), Seasons Cleveland LLC (7367), Lawrence Supermarket LLC (8258), Upper West Side Supermarket LLC (8895) and Seasons Corporate LLC (2266) (collectively the "Debtors"). The mailing address for the Debtors, solely for purposes of notices and communications, is: 5 Doughty Boulevard, Inwood, NY 11096.

Lakewood"), Seasons Maryland LLC ("Maryland"), Seasons Clifton LLC ("Clifton"), Seasons Cleveland LLC ("Cleveland"), Lawrence Supermarket LLC ("Lawrence"), Upper West Side Supermaket LLC ("Upper West Side", and collectively with Blue Gold, Central Avenue, Amsterdam Avenue, Wilmot Road, Inwood, Lakewood, Maryland, Clifton, Cleveland and Lawrence the "Operating Entities") and Seasons Corporate LLC ("Corporate") and, collectively with the Operating Entities, the "Debtors", and each separately a "Debtor") the above-captioned debtors and debtors-in-possession, by and through their undersigned counsel, respectfully submit this motion (the "Motion"), pursuant sections 105(a), 361, 362, 363, 364 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Eastern District of New York (the "Local Rules") for the entry of interim (the "Interim Order") and final orders (the "Final Order" and together with the Interim Order, the "DIP Orders"), *inter alia*, (i) authorizing the Debtors to enter into a senior secured superpriority debtor-in-possession term loan in the aggregate principal amount of Five Million Seven Hundred Thousand Dollars ($5,700,000) (as amended, modified and otherwise in effect from time to time, the "DIP Facility") substantially on the terms set forth in the Debtor in Possession Loan and Security Agreement between the Debtors and SKNY LLC ("Lender" or "Buyer"), annexed hereto as Exhibit A[2] (as amended, supplemented, or otherwise modified and in effect from time to time, the "DIP Loan and Security Agreement" and, together with any and all schedules thereto and other related documents, notes and agreements entered into in connection with or related to the DIP Facility, the "DIP

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the DIP Loan and Security Agreement. All obligations under the DIP Loan and Security Agreement are hereinafter referred to as the "DIP Obligations."

2

Documents"),(ii) authorizing the Debtors to utilize cash collateral and grant adequate protection, (iii) scheduling a final hearing pursuant to Rules 4001(b) and (c) of the Bankruptcy Rules. In support of this Motion, the Debtors respectively represents as follows:

### Jurisdiction and Venue

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. § 1408.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.      The statutory predicates for the relief sought herein are sections 105(a), 362, 364 and 507 of Bankruptcy Code and Rules 2002, 4001 and 9014 of the Bankruptcy Rules.

### Background

3.      On the date hereof (the "Petition Date"), the Debtors commenced these cases by each filing a voluntary petition for relief under chapter 11 the Bankruptcy Code.

4.      The Debtors have continued in possession of their properties and are operating and managing their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      No request has been made for the appointment of a trustee or examiner, and a creditors' committee has not been appointed in these cases.

6.      The Court and interested parties are respectfully referred to the *Declaration of Joel Getzler Pursuant to Local Bankruptcy Rule 1007-2 in Support of First Day Motions*, dated September 16, 2018 [Docket Entry No. __] (the "First Day Declaration") for a detailed discussion regarding the Debtors, their operations, and the events leading to the filing of the Bankruptcy Case.

7.    The Debtors are engaged in the business of owning and operating kosher supermarkets markets in New York, New Jersey, Ohio and Maryland.

8.    In connection with these bankruptcy cases and as a condition of the DIP Facility, the Debtors seek to consummate the sale of certain of their assets pursuant to the *Motion for Orders Pursuant to Sections 105(a), 363, 365 and 1146(c) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006  (A) Fixing the Time, Date, and Place for the Bidding Procedures Hearing; (B)(i) Establishing Bidding Procedures and Bid Protections in Connection with the Sale of Certain of the Assets of the Debtors, (ii) Approving the Form and Manner of Notices, (iii) Approving the Asset Purchase Agreement Subject to Higher and Better Offers and (iv) Setting a Sale Hearing Date, and (C)(i) Approving the Sale of Certain Assets of the Debtors Free and Clear of Liens, Claims and Encumbrances, (ii) Authorizing the Assumption and Assignment of Certain Unexpired Leases and Executory Contracts and (iii) Authorizing the Rejection of Non-Assumed Unexpired Leases and Executory Contracts, and (iv) Granting Related Relief* (the "Sale Motion"), filed contemporaneously herewith or promptly following the date hereof, and the APA (as defined in the Sale Motion), subject to higher and better offers as outlined in the Sale Motion and as may be prescribed by the Court in the Bidding Procedures Order (as defined in the Sale Motion).

A.    **Secured Debt**

9.    In February 2018, Lender loaned $1 million (the "February 2018 Secured Loan") to the Operating Entities, evidenced by a promissory note and a security agreement ("Prepetition Security Agreement") pursuant to which the Operating Entities granted Lender a security interest in all their assets.  In March 2018, SKNY loaned an additional $1 million to the Operating Entities subject to the Prepetition Security Agreement and the original promissory note was replaced by an Amended and Restated Promissory Note in the amount of

$2 Million (the "March 2018 Secured Loan"). On September 5, 2018, pursuant to a Second Amended and Restated Promissory Note and the Prepetition Security Agreement, SKNY made an additional $1,000,000 available to the Debtors and funded $250,794.64 for payroll and $400,000 (the "September 5, 2018 Secured Loan") to the Debtors to provide them with the necessary funds to retain Zeichner Ellman & Krause LLP as counsel to the Debtors, Getzler Henrich & Associates LLC ("GHA") as restructuring consultants to the Debtors (as well as retention of Joel Getzler and William Henrich as Co-Chief Restructuring Officers and other GHA employees) and Omni Management Group as Claims Agent for the Debtors.   On September 7, 2018, Lender advanced another $165,000 for the purpose of allowing the Debtors to pay insurance premiums, which were due on September 10, 2018 (the "September 7, 2018 Secured Loan", and collectively with the February 2018 Secured Loan, the March 2018 Secured Loan and the September 5, 2018 Secured Loan, the "Prepetition Secured Loan").  As of the Petition Date, the Debtors owed approximately $3,250,000 to Lender on account of the Prepetition Secured Loan.

10.    In October 2016, Bank United loaned $10 Million (the "Bank United Loan") Corporate and obtained a security interest in all of Corporate's assets[3]. The Operating Entities guaranteed the Bank United Loan on an unsecured basis.  Prior to the Petition Date, Bank United declared a default under the Bank United Loan and set-off the liability against $600,000 maintained in Central Avenue's accounts.  As of the Petition Date, approximately $8,000,000 was owed to Bank United on account of the Bank United Loan.

---

[3]  Corporate's assets consist of its 100% membership interest in each of the other Debtors.  Bank United does not hold a security interest in any cash because as of the Petition Date, Corporate did not hold any cash in any account at Bank United.

B.    **The Proposed Sale**

11.    The Debtors have determined that an expeditious sale of the operating assets of the Debtors' Businesses is necessary to preserve and maximize value, and that a reorganization is not a viable option due to the Debtors' liquidity constraints.

12.    Prior to the Petition Date, the Debtors engaged in discussions with other possible DIP lenders, including at least one who may present alternative bids at the Sale.

13.    On September 16, 2018, the Debtors and the Lender agreed to the terms and conditions contained in the form of the APA,[4] pursuant to which the Debtors proposed to sell substantially all of their assets to the Lender and the Lender agreed to assume certain liabilities of the Debtors.

14.    In the Sale Motion, the Debtors have proposed that the Lender's offer to purchase the Acquired Assets shall serve as a stalking horse bid, which shall remain subject to higher and better offers.

15.    In addition to the APA, the Debtors and the Lender have negotiated the terms of a debtor-in-possession loan from the Lender. Negotiations of the APA and the DIP Documents in connection with the DIP Facility for which the Debtors are seeking approval herein, continued with the Lender up until the Petition Date.

16.    The Debtors' estate has insufficient funds to continue to operate the Debtors Businesses and as a result, the value of the Acquired Assets will rapidly diminish if a sale is not quickly consummated. Thus, the Debtors believe that the competitive bidding process for certain of its assets (the "Sale"), as contemplated in the Sale Motion, must take place on an expedited schedule to ensure that value is preserved and maximized. The Debtors have

---

[4]    The Debtor reserves the right to revise the APA prior to the commencement of the Auction.

negotiated with the Lender under the DIP Documents and pursuant to the APA to present this Motion on a consensual basis in order to expedite this process and achieve the highest value possible for creditors.

**C.    The Proposed DIP Loan and Security Agreement**

17.    Subject to the approval of the Bankruptcy Court, the Debtors propose to enter into a debtor-in-possession financing facility to fund the administration of these bankruptcy cases post-petition.   The DIP Facility will provide the Debtors with up to $5,700,000 in liquidity to fund operations and the administration of these bankruptcy cases through the closing date of the sale of the Debtor's assets and transfer of certain liabilities to Lender under the APA or to a higher or better bidder for the assets, in accordance with and as outlined in the Sale Motion.

18.    The principal terms for the DIP Documents are as follows:[5]

| Borrowers: | The Debtors |
|---|---|
| DIP Lender: | SKNY LLC |
| DIP Facility Amount: | $5,700,000, plus interest, fees and Lender's expenses.  Upon the entry of the Interim Order, but prior to the entry of the Final Order, the Debtors will be authorized to obtain financing, pursuant to the terms of the Interim Order and the DIP Documents, equal to $4,000,000 (the "Interim Advance"). <br><br> Roll-Up Loans. Subject to the terms and conditions set forth herein and in the Financing Orders, the Prepetition Indebtedness shall be substituted and exchanged for loans under the DIP Facility and shall become part of the DIP Obligations. |
| Maturity Date: | The DIP Facility shall mature on the later of (a) the closing date of the sale of certain of the assets of the Debtor (the "Sale Transaction"), and (b) December 31, 2018. |
| Funding Dates: | The Debtors shall be funded with the Interim Advance after entry of the Interim Order and will receive the remaining portion of the |

---

[5]    This summary is qualified in its entirety by the actual terms of the DIP Documents.

| | DIP Facility after entry of the Final Order, in each case, in accordance with the Budget attached hereto as <u>Exhibit B</u> and the terms and conditions of the DIP Loan and Security Agreement. |
|---|---|
| **Use of Proceeds:** | The Debtors will use the proceeds of the DIP Facility solely (a) to pay fees and expenses related to the consummation of these bankruptcy cases and the consummation of this agreement and (b) for other general corporate purposes of the Debtor for the purposes set forth in the Budget. No portion of the DIP Facility or any cash collateral shall be available for any fees or expenses incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against (i) the Lender or (ii) in connection with challenging the DIP Facility or the Sale Motion, including fees and expenses applicable to the Debtors soliciting or negotiating a sale of the Acquired Assets for a higher and better amount. |
| **Reimbursement of Lender's Professionals:** | The Debtors will pay all reasonable and actual fees and expenses of the Lender's professionals in connection with the DIP Facility. |
| **Interest Rate:** | The non-default interest rate and the default interest rate applicable to the DIP Facility shall be six (6%) percent per annum and (12%) percent per annum respectively, calculated on a 365 day year for the actual days elapsed. |
| **Security and Priorities:** | Subject to the Carve Out (as defined below), Lender will receive a valid and perfected first-priority lien on all now owned and hereafter acquired Collateral (as defined in the DIP Loan and Security Agreement), in the following: all of the Debtors' right, title and interest in, to and under all real, personal, tangible, intangible, or mixed property, whether now owned or hereafter acquired in fee simple or leased by the Debtors, including, without limitation all bank accounts, deposits and cash, wherever located, and all proceeds (including the proceeds of any asset sales to third parties), products, rents, revenues and profits of any of the foregoing, all causes of action (except causes of action of Debtors estate under Chapter 5 of the Bankruptcy Code), and including, but not limited to the following, in each case now owned or at any time hereafter acquired by any Debtor or in which any Debtor now has or at any time in the future may acquire any right, title or interest: (i) all Accounts; (ii) all Inventory; (iii) all Equipment; (iv) all Contract Rights; (v) all Chattel Paper, (vi) Instruments and Documents; (vii) all Intellectual Property; (viii) all General Intangibles; (ix) all Deposit Accounts; (x) all Goods; (xi) all Investment Property; (xii) all Letter of Credit Rights; (xiii) all Commercial Tort Claims; (xiv) to the extent not otherwise included, all rights, proceeds and payments under insurance with respect to |

| | |
|---|---|
| | any of the Collateral or otherwise of which any Debtor is the beneficiary; (xv) all other goods and real or personal property whether tangible or intangible, including without limitation, all other rights to payment not specified above, and whether now or hereafter owned or existing, leased, consigned by or to, or acquired by, any Debtor and wherever located; (xvi) all books and records relating to any of the foregoing; and (xvii) to the extent not otherwise included, all Proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of each of the foregoing. |
| **Superpriority Claims:** | Pursuant to section 364(c) of the Bankruptcy Code and the Interim and Final Orders, all obligations of the Debtors under the DIP Documents (including any exposure of the Lender in respect of cash management or hedging transactions incurred on behalf of the Debtors) at all times shall constitute allowed super-priority administrative expense claims in the Debtors' bankruptcy cases having priority over all administrative expenses of the kind specified in section 503(b) or section 507(b) of the Bankruptcy Code, subject only to the Carve-Out. |
| **Carve-Out:** | The following amounts shall be payable from the DIP Facility and chargeable against the Collateral prior to the liens and security interests that are granted to the Lender hereunder: (i) the unpaid fees due and payable to the Clerk of the Court and the Office of the United States Trustee pursuant to 28 U.S.C. § 1930, and (ii) the allowed professional fees and expenses of Debtors' counsel, as set forth in the Budget. |
| **Affirmative and Negative Covenants:** | The DIP Documents contain usual and customary affirmative and negative covenants for facilities of this type and nature, including, without limitation:<br><br>(I) affirmative covenants of the Debtors to:<br><br>(a) Pay, discharge or otherwise satisfy all post-Petition Date obligations and liabilities as required pursuant to the Bankruptcy Code or by order of the Court.<br><br>(b) Furnish to Lender on the date the DIP Loan and Security Agreement is executed the Debtors shall provide the Lender with a budget through the Maturity Date in form, detail and substance acceptable to the Lender (the "Budget"), that covers the projected expenses, disbursements, receipts and revenues for each week through the Maturity Date. The Debtors covenant and agree that, subject to the receipt of the prior written consent of the Lender, no payments shall be made by the Debtors that exceed one hundred |

and fifteen percent (115%) of any line-item amount set forth in the Budget.

(c) Maintain with financially sound and reputable insurance companies, insurance on all Collateral in at least such amounts and with only such deductibles as are usually maintained, and against at least such risks as are usually insured against in the same general area, by companies engaged in the same or a similar business; and furnish to Lender, at their request, full information as to the insurance carried.

(d) Keep proper books of record and account in which complete and correct entries are made of all dealings and transactions in relation to the Debtors' business and activities and which permit financial statements to be prepared in conformity with GAAP and all applicable Laws.

(e) Deposit and maintain all proceeds of the DIP Loan in only such accounts permitted by the Court's order approving the Debtors' use after the Petition Date of their existing bank accounts and cash management system.

(f) Promptly permit representatives of Lender, upon prior written notice to the Debtors, from time to time during normal business hours to (a) visit and inspect any Property of the Debtors as often as Lender shall reasonably deem advisable, (b) make such inspections of, abstracts from and copies of the Debtors' books and records as Lender shall deem advisable, and (c) discuss with the Debtors' members, officers and the auditors of the Debtors, the Debtors' business, operations, assets, liabilities, financial positions, results of operations and business prospects as often as Lender shall deem advisable.

(g) Use the proceeds of the DIP Loan solely in accordance with the Budget (as applicable) subject to the Permitted Variance and upon the terms and conditions set forth in this Agreement.

(h) Comply in all material respects with all requirements of law applicable to the Property (including but not limited to requirements relating to the environment or hazardous or toxic substances) and the Bankruptcy Code.

(i) Furnish to Lender written notice of any Event of Default on the day Debtors becomes aware of the occurrence of such Event of Default.

(j) Pay the proceeds of (i) the sale or other disposition of Collateral, (ii) any issuance of equity securities by any Debtor, or (iii) any incurrence of indebtedness (other than in the ordinary course of business), to the Lender to be applied to reduce the DIP Obligations.

(k) Execute any and all further documents, financing statements, agreements and instruments, and take all further action that may be required under applicable law, or that the Lender may reasonably request, in order to effectuate the transactions contemplated by the DIP Documents.

(l) Use their best efforts to obtain an order of the Court authorizing the Debtors to enter into the DIP Documents and the sale related motions.

(m) Keep the Lender reasonably informed at all times on all matters related to the sale and auction process of its assets under section 363 of the Bankruptcy Code.

(n) Pay all taxes, assessments and governmental charges or levies imposed upon their property.

(o) except with the prior written consent of the Lender, preserve and maintain, its existence, legal structure, legal name, rights (charter and statutory), permits, licenses, approvals, privileges and franchises.

(p) Maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, all of its properties that are necessary in the conduct of its business in good working order and condition, ordinary wear and tear excepted.

(q) Conduct all transactions otherwise permitted under the DIP Documents with an Affiliate on terms that are fair and reasonable and no less favorable to the Debtors than they would obtain in a comparable arm's length transaction with a Person not an Affiliate and in connection therewith shall not enter into any agreement requiring payments in breach of the foregoing, *provided* that the foregoing shall not apply to customary fees to, and indemnifications of, non-officer directors of the Debtors in compliance with the Budget.

(ii) negative covenants of the Debtors not to (a) sell all or any portion of the Collateral without the prior written consent of the Lender, (b) merge into or consolidate with any Person or permit any Person to merge into it, (c) make or hold any Investment in any Person, except the exceptions set forth in the DIP Documents.

(II) <u>negative covenants of the Debtors to not</u>:

(a) Create, incur, assume or suffer to exist any debt, except: Debt in existence on the date of the DIP Loan and Security Agreement; and Debt incurred by the Debtors within the Budget, subject to the Permitted Weekly Variance, in the ordinary course of business in the form of accounts payable and accrued expenses.

(b) Create, incur, assume or suffer to exist any Lien upon any of their property, assets, income or profits, whether now owned or hereafter acquired, except Permitted Liens and the Carve Out.

(c) Use the proceeds of the DIP Loan for any purpose not set forth in each respective Budget or in Section 2.3 hereof, subject to the Permitted Weekly Variance.

(d) Incur, or apply to the Court for authority to incur, or suffer to exist, any (i) indebtedness having the priority afforded by Section 364(c) or (d) of the Bankruptcy Code (including any Superpriority Claims) other than the financing provided for under this Agreement and the other DIP Loan Documents or (ii) obligation to make adequate protection payments, or otherwise provide adequate protection, other than as contemplated by the Interim Order or the Final DIP Order or in the Budget, or as may be required by order of the Court in connection with the provision of adequate protection to holders of Permitted Liens whose collateral is sold or otherwise disposed of or as to which Lender consents, provided, however, that on an interim basis, the Lender is prepared to accept the lien priority established by the Interim Order entered in a form that is satisfactory to the Lender in its sole discretion.

(e) Limit, affect or modify, or apply to the Court to limit, affect or modify, any of Lender's rights with respect to the DIP Obligations, including rights with respect to the Collateral and the priority thereof, except with the prior written consent of Lender.

(f) Sell, assign, transfer, hypothecate or encumber all or any portion of the Collateral without the prior written consent of the Lender. For the avoidance of doubt, while no Event of Default exists, Collateral consisting of cash accounts receivable and inventory created in the ordinary course of business may be used by the Debtors in the ordinary course of their businesses. Existing Ownership.

(g) (i) Issue any equity securities, (ii) cancel any authorized equity securities or (iii) alter existing membership structure, or take any

|  | |
|---|---|
|  | other action, so as to further or cause an ownership change within the meaning of Section 382 of the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"). Upon acquiring information or knowledge that any person or entity may take action to become a "5% shareholder" within the meaning of Section 382 of the Internal Revenue Code, the Debtors shall immediately advise the Lender of such circumstance, shall consult in good faith with the Lender as to any commercially reasonable actions that the Debtors may take to prevent such person or entity becoming a "5% shareholder," and shall take any and all such commercially reasonable actions mutually agreed upon with the Lender.<br><br>(h) Except as permitted under the Final DIP Order, apply to the Court for the authority to incur, create, assume, suffer or permit any claim, Lien or encumbrance (other than Permitted Liens and the Carve Out) against the Debtors, or any of their assets in the Chapter 11 Case to be pari passu with, or senior to, the Liens and claims of Lender granted and arising under the DIP Loan Documents.<br><br>(i) Create or permit to exist any Superpriority Claims (other than with respect to this Agreement or the Financing Orders and other than the Carve Out).<br><br>(j) Undertake any alterations or modifications to the Property without Lender's prior written consent.<br><br>(k) Transfer, directly or indirectly, any of their right, title or interest in, to or under any of the Collateral without the Lender's prior written consent. |
| **Exit Fee** | The unpaid principal amount of the DIP Loan, together with any and all accrued interest thereon through the date of prepayment, may be voluntarily paid or prepaid, in whole or in part, without premium or penalty; provided, however, that in the event the Bankruptcy Court enters a Final Order approving an Alternate Transaction (as defined in the APA), then the Lender shall be entitled to and Debtors shall pay to Lender at the consummation of an Alternate Transaction a fee equal to 2% of the outstanding DIP Obligations (the "Exit Fee"). |
| **Conditions Precedent:** | Customary for credit facilities of this nature, including the delivery of certain documents to Lender. |

| | |
|---|---|
| **Section 506(c):** | It shall be considered an Event of Default under the DIP Documents if any claims under section 506(c) of the Bankruptcy Code are asserted against the Lender. |
| **Modification of the Automatic Stay:** | Subject solely to any requirement of the giving of notice by the terms of the Interim Order or the Final Order, the automatic stay provided in section 362 of the Bankruptcy Code shall be deemed automatically modified without further action or order of the Bankruptcy Court, and the Lender, upon three business days' written notice to the Debtor, shall be entitled to exercise all of its rights and remedies under the DIP Documents, including all rights and remedies with respect to the Collateral. |
| **Releases:** | Lender, subject to the entry of a Final Order, shall be released by the Debtors from any and all claims, liens, priority, actions or inactions arising hereunder or in any other manner, with such releases being satisfactory to the Lender its discretion. |
| **Events of Default:** | Each of the following events shall be an "Event of Default" under the DIP Loan and Security Agreement: <br><br> (a) The Debtors shall fail to pay any principal or interest of the DIP Loan or any other DIP Obligation (including any fees or reimbursable amounts) when any such amount becomes due in accordance with the terms hereof, which failure continues for a period of five (5) Business Days after notice thereof from Lender. <br><br> (b) The Debtors shall default in the observance or performance of any covenant, agreement, obligation or restriction set forth in this Agreement or any other DIP Loan Document, and such Default shall continue for a period of ten (10) Business Days after notice thereof from Lender. <br><br> (c) The Court shall enter an order with respect to the Debtors dismissing the Chapter 11 Case or converting it to a case under chapter 7 of the Bankruptcy Code, or, without the prior written consent of Lender (i) appointing a trustee in the Chapter 11 Case or (ii) appointing a responsible officer or an examiner with enlarged powers relating to the operation of the Debtors' business (beyond those set forth in Section 1106(a)(3) or (4)) under Bankruptcy Code Section 1106(b). <br><br> (d) Any of the Financing Orders are reversed, modified, rescinded, amended or vacated. <br><br> (e) An Event of Default (as defined in the APA) has occurred and is continuing under the APA. |

(f) The filing of a Chapter 11 Plan for the Debtors does not provide for the consummation of the transactions contemplated by the APA or the payment in cash in full of the DIP Obligations on or before the Maturity Date.

(g) The Debtor shall fail to comply with the terms of any of the Financing Orders, if any.
(h) The Bankruptcy Court shall not have entered the Final DIP Order on or before October 19, 2018.

(i) The APA is terminated for any reason other than a default of the Lender under the APA or another party being the successful bidder under the APA.

(j) The Debtors shall use the proceeds of the Loans in a manner not provided for herein.

(k) The filing of a motion to approve post-petition financing that will be secured by Liens on the Collateral that are equal or senior to the Liens granted to Lender in connection herewith.

(l) Any challenge in a legal proceeding to the validity or enforceability of this Agreement, or any Financing Order or any term hereunder or thereunder.

(m) The Bidding Procedures Order (as defined in the APA), which authorize the Lender to credit bid the Prepetition Indebtedness and the DIP Obligations pursuant to Sections 363(f) and 363(k), shall not have been entered by the Bankruptcy Court on or prior to October 9, 2018.

(n) The Sale Order approving the Sale to Lender shall not have been entered by the Bankruptcy Court on or prior to December 31, 2018.

(o) The Bankruptcy Court authorizes or approves an Alternative Transaction (as defined in the APA), or (ii) the Debtors withdraw or seek authority to withdraw their motion seeking approval of the transactions contemplated by the APA.

(p) There occurs any Material Adverse Change, including without limitation, any impairment to the value of Collateral which Lender, in good faith, deems will threaten timely payment in full of the DIP Loan.

| | (q) The Court grants any superpriority administrative expense claim or Lien or enters any order granting relief from the automatic stay (if not in favor of Lender) on any assets of the Debtors which have an aggregate value in excess of $50,000, except with the express written consent of Lender.<br><br>(r) The Debtors shall assume or reject any unexpired lease or executory contract without the prior written consent of the Lender. |
|---|---|

### D.    Compliance with Rule 4001-2 of the Local Rules

19.    Rule 4001-2 of the Local Rules requires that certain provisions contained in the financing documents and/or Interim Order be highlighted, and that the Debtors must provide justification for the inclusion of such highlighted provision(s). The Debtors believe that certain provisions of the DIP Facility implicate Local Rule 4001-2, and that such provisions are justified and necessary in the context and circumstances of this bankruptcy case. Accordingly, the Debtors have set forth each of the sub-sections of Rule 4001-2 of the Local Rules and have detailed whether or not the DIP Documents, this Motion and/or the DIP Orders contain or contemplate provisions which would fall within the ambit thereof:

- Local Rule 4001-2(1): This Motion and the DIP Orders sets forth the amount of credit the Debtors seek to obtain, including any committed amount under the DIP Loan and Security Agreement.

- Local Rule 4001-2(2): This Motion describes all material conditions to closing and borrowing, including budget provisions.

- Local Rule 4001-2(3): This Motion describes all material pricing and economic terms, including letter of credit fees, commitment fees, any other fees, and the treatment of costs and expenses of the lender, any agent for the lender, and their respective professionals, in each case to the extent applicable.

- Local Rule 4001-2(4): The Motion describes the effects on existing liens of the granting of collateral or adequate protection provided to the Lender and any priority or superpriority provisions.

- Local Rule 4001-2(5): This Motion describes any applicable carve-outs from liens or superpriorities;

- <u>Local Rule 4001-2(6)</u>:   The DIP Documents do not contemplate any cross-collateralization provision that elevates prepetition debt to administrative expense (or higher) status or that secures prepetition debt with liens on postpetition assets (which liens the creditor would not otherwise have by virtue of the prepetition security agreement or applicable law).

- <u>Local Rule 4001-2(7)</u>: The DIP Documents contemplate a roll-up of the Lender' prepetition loan and applies the proceeds of postpetition financing to pay, in whole or in part, prepetition debt or which otherwise has the effect of converting prepetition debt to postpetition debt.

- <u>Local Rule 4001-2(8)</u>: The DIP Documents to not contemplate any provision that would limit the Court's power or discretion in a material way, or would interfere with the exercise of the fiduciary duties, or restrict the rights and powers, of the trustee, debtor in possession, or a committee appointed under § 1102 or § 1114 of the Bankruptcy Code, or any other fiduciary of the estate, in connection with the operation, financing, use or sale of the business or property of the estate, but excluding any agreement to repay postpetition financing in connection with a plan or to waive any right to incur liens that prime or are pari passu with liens granted under § 364.

- <u>Local Rule 4001-2(9)</u>:  This Motion describes the implementation and restrictions on the Debtors with respect to the use of proceeds under DIP Loan and Security Agreement as reflected in the Budget.

- <u>Local Rule 4001-2(10)</u>:   This Motion describes applicable events of default, any effect of termination or default on the automatic stay or the lender's ability to enforce remedies, any cross-default provision, and any events on which the availability of credit will cease.

- <u>Local Rule 4001-2(11)</u>:   The DIP Documents do not contemplate any change-of-control provisions.

- <u>Local Rule 4001-2(12)</u>:   This Motion describes any applicable provision establishing a deadline for, or otherwise requiring, the sale of property of the estate.

- <u>Local Rule 4001-2(13)</u>: The DIP Documents do not contemplate any provision that affects the debtor's right or ability to repay the financing in full during the course of the chapter 11 reorganization case.

- <u>Local Rule 4001-2(14)</u>:  This rule is not applicable.

- <u>Local Rule 4001-2(15)</u>:  This rule is not applicable.

## Requested Relief and Basis Therefor

20.     The Motion requests, pursuant to sections 105, 361, 362, 363, 364 and 507 of

the Bankruptcy Code and Rules 4001 and 9014 of the Bankruptcy Rules, entry of the proposed

Interim Order, attached as Exhibit C hereto, and Final Order, attached as Exhibit D hereto,

authorizing (i) borrowing, with priority over administrative expenses (other than the Carve-

Out as defined in the Security Agreement) and secured by liens on property of the Debtor's

estate, on an interim basis in an amount up to $4,000,000 and on a final basis in the aggregate

committed amount of $5,7000,000, plus interest, fees and expenses of the Lender; (ii)

authorizing the use of the Lender's Cash Collateral and the granting of adequate protection (iii)

modifying the automatic stay; and (iv) giving notice of the final hearing on the motion (the

"Final Hearing").  Pending the Final Hearing, the DIP Facility will be implemented on an

interim basis pursuant to the terms of the DIP Documents attached hereto as Exhibit A and the

proposed Interim Order attached hereto as Exhibit C.

21.     The "Collateral" securing the DIP Facility shall include (each as defined in the

DIP Loan and Security Agreement) (i) all Accounts; (ii) all Inventory; (iii) all Equipment; (iv)

all Contract Rights; (v) all Chattel Paper, (vi) Instruments and Documents; (vii) all Intellectual

Property; (viii) all General Intangibles; (ix) all Deposit Accounts; (x) all Goods; (xi) all

Investment Property; (xii) all Letter of Credit Rights; (xiii) all Commercial Tort Claims; (xiv)

to the extent not otherwise included, all rights, proceeds and payments under insurance with

respect to any of the Collateral or otherwise of which a Debtor is the beneficiary; (xv) all other

goods and real or personal property whether tangible or intangible, including without

limitation, all other rights to payment not specified above, and whether now or hereafter owned

or existing, leased, consigned by or to, or acquired by, a Debtor and wherever located; (xvi) all

books and records relating to any of the foregoing; and (xvii) to the extent not otherwise

included, all Proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of each of the foregoing.

22.    The credit provided under the DIP Facility will enable the Debtors to continue to operate their Businesses in the ordinary course and in an orderly and reasonable manner to preserve and enhance the value of their estates for the benefit of all parties in interest. The availability of credit under the DIP Facility will also provide confidence to the Debtors' creditors and counterparties that will enable and encourage them to continue their relationships with the Debtors.

23.    Finally, the implementation of the DIP Facility will likely be viewed favorably by the Debtors' employees, dealers and vendors, thereby promoting consummation of a sale of all or substantially all of the Debtors' assets pursuant to and in accordance with the Sale Motion and, in turn, potentially enabling the Debtors to provide a distribution to the Debtors' remaining creditors thereafter. Accordingly, the timely approval of the relief requested herein is imperative.

A.    **The DIP Facility Should be Approved**

24.    Bankruptcy Code section 364(c) provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under Bankruptcy Code section 503(b)(1), the court may authorize the debtor to obtain credit or incur debt (i) with priority over any and all administrative expenses as specified in Bankruptcy Code section 503(b) or 507(b); (ii) secured by a lien on property of the estate that is not otherwise subject to a lien; or (iii) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364(c).

25.    The statutory requirement for obtaining post-petition credit under section 364(c) is a finding, made after notice and hearing, that the debtor is "unable to obtain unsecured

credit allowable under section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c). See also In re Crouse Group Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987). Courts have applied the following three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code:

> (i)    the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim;
>
> (ii)    the credit transaction is necessary to preserve the assets of the estate; and
>
> (iii)    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

Crouse Group, 71 B.R. at 549.  As discussed below, each of these elements is satisfied.

### a.    The Debtors are Unable to Obtain Unsecured Credit

26.    The Debtors requires working capital in order to preserve and maintain their Businesses during the bankruptcy cases up to the date on which they consummate the Sale pursuant to the Sale Motion.  In making the decision to sell their assets under section 363 of the Bankruptcy Code, and seek financing as a part of that transaction, the Debtors considered the impending collapse of the Debtors' business and the best opportunity to save the business and the jobs of approximately 400 employees.

27.    In order to complete a sale of its assets and create value for the Debtors' creditors, the Debtors would need immediate financing. No other party had the requisite knowledge of the Debtors' businesses to move on an immediate basis.  Moreover, when the Debtors were unable to fund payroll and insurance premiums, they faced immediate cessation of their business operations which would have been catastrophic. The Lender stepped forward, without adequate financial information, and provided the necessary funding as well as funding of retainers for professionals, to keep the operations going and facilitate a bankruptcy filing

which would preserve the value of the Debtors' businesses. A condition of that funding was the Debtors' agreement to proceed, in the first instance, with a DIP loan and APA presented by the Lender on terms that are generally favorable.

28. In short, the Debtors have determined that a consensual DIP Facility with the Lender, and proposed buyer will save expense, time, and costly valuation litigation at the outset of these chapter 11 cases, thereby allowing the Debtors to preserve value and focus on the Sale of their assets in an effort to provide a distribution to those creditors who are not otherwise satisfied as part of the assumption of liabilities by Lender pursuant to the APA. Moreover, the DIP Obligations will be satisfied upon consummation of the Sale given that the Lender is credit bidding the DIP Obligations as part of the Purchase Price in the APA.

29. Accordingly, the Debtors has determined that the DIP Facility offered by the Lender as part of its overall bid for the Debtor's assets is their best option for post-petition financing.

b.    **The Transactions Under the DIP Documents are Necessary to Preserve the Estate**

30. Without access to post-petition financing, the Debtors will be unable to operate the Businesses as going concerns, which would, in turn, significantly impair the value of the Debtors' assets and jeopardize the Debtors' ability to sell their assets to the detriment of all creditor constituencies. The Debtors have very little cash and, as described above, almost no liquidity with which to consummate the Sale.

31. By obtaining the DIP Facility, the Debtors will be in a position to preserve the value of their assets during the chapter 11 process for the benefit of all creditors and work towards confirming a plan. It is vital to the success of the bidding process outlined under the Sale Motion and confirmation of a plan that the Debtors obtain approval to immediately access

the DIP Facility, on an interim and final basis, as contemplated by the DIP Loan and Security Agreement.

32.     Absent approval of the relief sought herein, the Debtors face a substantial risk of irreparable damage to the value of their assets and the probability of conversion of the bankruptcy cases to cases under chapter 7 without the ability to sell their assets in an orderly manner for the benefit of the Debtors' creditors. *See* In re Sun Healthcare Group, Inc., 245 B.R. 779, 781 (Bankr. D. Del. 2000) (noting that the court had approved debtor-in-possession financing to "permit the Debtors to continue to operate to preserve their estates"). Accordingly, the Debtors need sufficient liquidity to avoid a forced liquidation of their assets on a "fire-sale" basis to the detriment of all creditors.

### c.     The Terms of the DIP Facility are Fair and Reasonable

33.     Moreover, the terms of the DIP Facility are fair and reasonable under the circumstances. The Debtors engaged in negotiations with the Lender regarding the proposed terms, worked with its advisors to obtain the best possible terms from the Lender and, eventually, reached an agreement with the Lender, not only for the provision of the DIP Facility, but also for the Sale of the Debtors' assets and for a consensual competitive bidding process as outlined in the Sale Motion and APA. Thus, the terms and conditions of the DIP Loan and Security Agreement were negotiated by the parties in good faith and at arms' length and, as outlined above, were instituted for the purpose of enabling the Debtors to meet ongoing operational expenses while in chapter 11 to preserve the going concern status of the Debtors as well as the value of the Collateral for the Sale of the assets pursuant to the Sale Motion.

34.     A debtor need only demonstrate that, notwithstanding its good faith efforts, credit was unavailable without the protections afforded to potential lenders by sections 364(c) and (d) of the Bankruptcy Code. *See* Bray v. Shenandoah Fed. Savs. & Loan Assoc. (In re

22

Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986); In re 495 Central Park Ave. Corp., 136

B.R. 626, 630-31 (Bankr. S.D.N.Y. 1992) (noting that, although "the debtor must make an

effort to obtain credit" it does not need "to seek alternate financing from every possible

lender."). In short, the Debtors concluded that adequate alternative financing terms more

favorable than those to be provided under the DIP Documents by the Lender as part of an

overall Sale transaction, are currently unavailable.

35.    Moreover, the Debtors believe that, in their business judgment, entry into the

DIP Documents is in their best interests. Provided that a debtor's business judgment does not

run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a

debtor considerable deference in acting in accordance therewith. See, e.g., Trans World

Airlines, Inc. v. Travellers Int'l AG. (In re Trans World Airlines, Inc.), 163 B.R. 964, 974

(Bankr. D. Del. 1994), rev'd on other grounds by 134 F.3d 188 (3d Cir. 1998) (approving

interim loan, receivables facility and asset-based facility based upon prudent business

judgment of the debtor); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990)

("Cases consistently reflect that the court's discretion under section 364 is to be utilized on

grounds that permit reasonable business judgment to be exercised so long as the financing

agreement does not contain terms that leverage the bankruptcy process and powers or its

purpose is not so much to benefit the estate as it is to benefit parties in interest."); see also

Funding Sys. Asset Mgmt. Corp. v. Key Capital Corp. (In re Funding Sys. Asset Mgmt. Corp.),

72 B.R. 87, 88 (Bankr. W.D. Pa. 1987); In re Curlew Valley Assocs., 14 B.R. 506, 513-14

(Bankr. D. Utah 1981).

36.    Accordingly, the Debtors respectfully assert that they have satisfied the

requirements of sections 364(c) and (d) of the Bankruptcy Code, that alternative credit on more

favorable terms was and is unavailable to the Debtors, and request that the Court enter the Interim Order approving the DIP Loan and Security Agreement and related DIP Documents to immediately preserve the Debtors' estate, and enter the Final Order to ensure that the Debtors' estate is maintained through the consummation of the Sale.

**B.**     **The Debtors Should Be Authorized to Use Cash Collateral**

37.     A debtor in possession may be authorized to use cash collateral in the ordinary course of its business operations under Bankruptcy Code §§ 363(c) and 1107.  The Court may condition such use, pursuant to Bankruptcy Code § 363(e), as is necessary to provide adequate protection of any interest held therein by any entity other than the debtor in possession.

38.     Courts repeatedly have recognized that use of cash collateral is appropriate where necessary to preserve a debtor's ability to reorganize and thus maximize the value of an estate for all interested parties. See In re Realty Southwest Assoc., 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992); H.R. Rep. No. 595, 95th Cong., 1st Sess. 344 (1977); 3 Collier on Bankruptcy 363.03 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2006); see also In re Dynaco, 162 B.R. 389, 396; In re Stein, 19 B.R. 458 (Bania. E.D. Pa. 1982).  Bankruptcy Rule 4001 (b) governs authorization for utilizing cash collateral and provides that the court may permit the debtor-in-possession to use cash collateral prior to a final hearing to the extent necessary to avoid immediate and irreparable harm.  After a final hearing held on at least fifteen days' notice, the court may grant the authority to use cash collateral on a permanent basis and other permanent relief requested herein.

39.     A chapter 11 debtor may not use cash collateral unless "(A) each entity that has an interest in such collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).

40.     The Debtors require the use of Cash Collateral to fund their operations. In the absence of the continued authorization to use Cash Collateral, the Debtors' ability to continue operating in the ordinary course of business will be jeopardized, causing immediate and irreparable harm to the Debtors' estates, their creditors, employees, and all other stakeholders by virtue of the loss of significant going-concern value. Thus, the Debtors' continued use of Cash Collateral is essential in order to enable the Debtors to meet the obligations of their ordinary operating costs and expenses during the pendency of the Chapter 11 Case. Among other things, the continued use of Cash Collateral will enable the Debtors to maintain business relationships with its vendors and customers, pay its employees, and satisfy other ordinary operational costs that are essential to preserve estate value by continuing to operate its business in the ordinary course.

41.     Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Permissible forms of adequate protection include periodic cash payments, additional liens, replacement liens, and other forms of relief. 11 U.S.C. § 361. The purpose of adequate protection is to protect a secured creditor from diminution in the value of its property interest in its collateral during the period of use, sale, or lease. In re Kain, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988); see also Delbridge v. Production Credit Assoc. and Fed. Land Bank, 104 B.R. 824, 827-28 (E.D. Mich. 1989); In re Ledgemere Land Corp., 116 B.R. 338, 343 (Bankr. D. Mass. 1990). The appropriate form of adequate protection must be determined on a case-

by-case basis. See In re O'Connor, 808 F.2d 1393, 1396 (10th Cir. 1987); In re Martin, 761 F.2d 472, 474 (8th Cir. 1985).

42.     In connection with its entry into the DIP Facility, the Lender has consented to the Debtor's continued use of Cash Collateral in accordance with the terms of the proposed Interim Order.  Accordingly, the Court should authorize the Debtors to use Cash Collateral in accordance with the terms set forth in the DIP Loan and Security Agreement, the Budget and the Interim Order.

43.     As set forth in the Interim Order, the Lender will receive adequate protection of its prepetition interests in the Cash Collateral in the form of (a) preservation and enhancement of collateral value through the ability to continue operating the Debtors' businesses, and (b) liens and claims junior only to the liens and claims securing the DIP Facility and the Carve-Out, (collectively, the "Adequate Protection").

44.     The Debtors respectfully submit that the Adequate Protection will sufficiently protect the Prepetition Secured Creditors interests in the Cash Collateral from any diminution in value and should be approved.

**C.     The Roll Up of the Prepetition Indebtedness Should Be Approved.**

45.     Upon final Court approval of the DIP Facility, the Prepetition Indebtedness will be converted into postpetition indebtedness under the DIP Facility.  The Debtors were unable to obtain debtor-in-possession financing on similar terms that did not provide for the repayment of prepetition amounts on these terms. Without continued access to capital to fund the Debtors' ordinary course operations and to fund the administration of these chapter 11 cases, the Debtors' businesses would cease and they would likely be forced to liquidate. Maintaining the ability to continue as a going concern is of immense benefit to the Debtors estates and stakeholders.

46.    The Lender is unlikely to lend postpetition without some assurance regarding its prepetition claim. Thus, after careful consideration of all available alternatives, the Debtors have determined that the Roll Up of the Prepetition Indebtedness as part of the DIP Facility is necessary to obtain access to the liquidity necessary to preserve the value of their businesses for the benefit of all stakeholders.

47.    The Lender has agreed to extend new financing on a postpetition basis, in an amount up to $5,700,000. Importantly, the Interim Order specifically states that the Roll Up is subject to unwinding, after notice and a hearing as required by, and under the circumstances set forth in, Local Rule 4001-2(k)(3), and Prepetition Secured Loan will only roll into postpetition financing on entry on the final order approving the DIP Facility.

48.    Recognizing exigent circumstances like those described above, courts in this district, as well as elsewhere, have approved repayments funded by debtor-in-possession financing proceeds in recent chapter 11 cases on an interim basis. See, e.g., In re Avaya Inc., No. 17-10089 (SMB) (Bankr. S.D.N.Y. Jan. 23, 2017) (approving interim roll-up of $50 million); In re Aéropostale, Inc., No. 16-11275 (Bankr. S.D.N.Y. May 6, 2016) (approving interim roll up of $78 million); In re Chassix Holdings, Inc., No. 15-10578 (MEW) (Bankr. S.D.N.Y. Mar. 13, 2015) (approving interim roll up of $135 million); In re United Retail Grp., Inc., No. 12-10405 (SMB) (Bankr. S.D.N.Y. Feb. 3, 2012) (approving interim roll up of $11.5 million); In re Uno Rest. Holdings Corp., No. 10-10209 (MG) (Bankr. S.D.N.Y. Feb. 18, 2010) (approving interim roll up of $33.9 million); In re Lyondell Chem. Co., No. 09-10023 (REG) (Bankr. S.D.N.Y. Jan. 6, 2009) (approving interim roll up of $2.1 billion).[6] Consistent with this

---

[6] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

authority, the Debtors respectfully submit that the Court should approve the Debtors' decision

to enter into the DIP Facility, including the required repayment of the Prepetition Secured Loan

**D.    The Automatic Stay Should Be Modified on a Limited Basis**

49.    The relief requested herein contemplates a modification of the automatic stay

(to the extent applicable) to permit the Debtors to grant the security interests, liens, and super-

priority claims described above and to perform such acts as may be requested to assure the

perfection and priority of such security interests and liens.  The Debtors further request that

the automatic stay be vacated and modified, to the extent necessary, to permit the Lender, to

exercise, immediately upon the occurrence of an Event of Default or otherwise as prescribed

therein, all rights and remedies under the DIP Documents or the Interim Order or Final Order,

as applicable.[7]

50.    Stay modifications of this kind are ordinary and standard features of post-

petition debtor financing facilities and, in the Debtors' business judgment, are reasonable and

fair under the present circumstances.

**E.    Interim Approval Should Be Granted**

51.    Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to

obtain credit may not be commenced earlier than 15 days after the service of such motion.

Upon request, however, the Court is empowered to conduct a preliminary expedited hearing

on the motion and the obtaining of credit to the extent necessary to avoid immediate and

irreparable harm to a debtor's estate pending a final hearing.

---

[7]  In any hearing regarding the Lender's exercise of rights or remedies in accordance with the DIP Documents, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the Debtors hereby waive any right to seek relief, including without limitation, under Bankruptcy Code section 105, to the extent such relief would in any way impair or restrict the rights and remedies of the Lender set forth in the Interim Order or Final Order, as applicable, or the DIP Documents.

52.     Pursuant to Bankruptcy Rules 4001(b) and (c), the Debtors request that the Court conduct an expedited preliminary hearing on this motion and (i) authorize the Debtors to borrow up to $4,000,000 under and subject to the terms of the DIP Loan and Security Agreement on an interim basis, pending entry of a final order, in order to (a) maintain and finance the ongoing operations of the Debtors; (b) fund the administration of this case; and (c) avoid immediate and irreparable harm and prejudice to the Debtors' estate, business operations and all parties in interest, and (ii) schedule the Final Hearing.

53.     The Debtors have an urgent and immediate need for cash to continue to operate. Currently, the Debtors does not have sufficient funds with which to operate its business on an ongoing basis.  Absent authorization from the Court to use Cash Collateral and obtain secured credit, as requested, on an interim basis pending the Final Hearing, the Debtors and their estates will be immediately and irreparably harmed.  The availability of interim loans under the DIP Loan and Security Agreement will provide necessary assurance of the Debtors' ability to meet their near-term obligations.  Failure to meet these obligations and to provide these assurances likely would have a long-term negative impact on the value of the Debtors' Businesses, to the detriment of all parties in interest.  Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Debtors and facilitating its reorganization efforts.

## Notice

54.     Notice of this Motion shall be provided to: (i) the Office of the United States Trustee for the Eastern District of New York; (ii) the United States Attorney for the Eastern District of New York; (iii) the parties included on the Debtors' consolidated list of thirty (30) largest creditors; (iv) all Secured Creditors, (v) all other parties required to receive service under Rules 2002-2 of the Local Bankruptcy Rules for the Eastern District of New York and

the Guidelines for First Day Motions adopted by the Board of Judges for the United States

Bankruptcy Court for the Eastern District of New York. Due to the urgency of the

circumstances surrounding this Motion and the nature of the relief in it, the Debtors

respectfully submit that no further notice of this Motion is required.

### No Prior Request

55.    No prior request for the relief sought in this Motion has been made to this or

any other court.

### Conclusion

**WHEREFORE**, the Debtors respectfully requests entry of the Interim Order and,

following the Final Hearing, entry of a Final Order, together with such other and further relief as

the Court deems appropriate.

Dated:    September 16, 2018
          New York, NY

ZEICHNER ELLMAN & KRAUSE, LLP

By: */s/ Nathan Schwed*_____
Nathan Schwed, Esq.
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 826-5317
Facsimile: (212) 753-0396
nschwed@zeklaw.com