**EXHIBIT C**

ASSET PURCHASE

AGREEMENT BY AND

AMONG

BLUE GOLD EQUITIES LLC, *ET AL*., AND

SKNY LLC

September 14, 2018

Page

ARTICLE I          DEFINITIONS ....................................................................................... 1
    Section 1.1     Definitions ........................................................................................... 1
    Section 1.2     Interpretations .................................................................................... 11

ARTICLE II         PURCHASE AND SALE ...................................................................... 12
    Section 2.1     Purchase and Sale of Assets ............................................................ 12
    Section 2.2     Assumed Liabilities .......................................................................... 12
    Section 2.3     Consideration; Deposit ..................................................................... 12
    Section 2.4     Breakup Fee and Expense Reimbursement ...................................... 13
    Section 2.5     Closing .............................................................................................. 13
    Section 2.6     Closing Payments and Deliveries ..................................................... 14
    Section 2.7     Intentionally Deleted ....................................................................... 14
    Section 2.8     Allocation ......................................................................................... 15
    Section 2.9     Proration ........................................................................................... 15
    Section 2.10    Removal of Excluded Assets ............................................................ 17

ARTICLE III        SELLERS' REPRESENTATIONS AND WARRANTIES ..................... 17
    Section 3.1     Organization of Sellers; Good Standing ........................................... 17
    Section 3.2     Authorization of Transaction ........................................................... 17
    Section 3.3     Noncontravention; Government Filings ............................................ 17
    Section 3.4     Title to Assets ................................................................................... 18
    Section 3.5     Real Property .................................................................................... 18
    Section 3.6     Litigation; Decrees ........................................................................... 18
    Section 3.7     Intentionally Deleted ....................................................................... 19
    Section 3.8     Brokers' Fees .................................................................................... 19
    Section 3.9     Taxes ................................................................................................. 19
    Section 3.10    Compliance with Laws; Permits ....................................................... 19
    Section 3.11    Disclaimer of Other Representations and Warranties ....................... 19

ARTICLE IV         PURCHASER'S REPRESENTATIONS AND WARRANTIES ............. 20
    Section 4.1     Organization of Purchaser; Good Standing ...................................... 20
    Section 4.2     Authorization of Transaction ........................................................... 20
    Section 4.3     Noncontravention ............................................................................. 20
    Section 4.4     Litigation; Decrees ........................................................................... 21
    Section 4.5     Brokers' Fees .................................................................................... 21
    Section 4.6     Sufficient Funds ............................................................................... 21
    Section 4.7     Adequate Assurances ........................................................................ 22

ARTICLE V          PRE-CLOSING COVENANTS ............................................................ 22
    Section 5.1     Efforts; Cooperation ......................................................................... 22
    Section 5.2     Conduct of the Business Pending the Closing ................................. 23
    Section 5.3     Intentionally Deleted ....................................................................... 24
    Section 5.4     Bankruptcy Court Matters ............................................................... 25
    Section 5.5     Notice of Developments ................................................................... 26
    Section 5.6     Access; No Contact .......................................................................... 26
    Section 5.7     Bulk Transfer Laws .......................................................................... 26

Page

Section 5.8        Replacement Bonding Requirements ........................................................26

ARTICLE VI        OTHER COVENANTS..................................................................................28
Section 6.1        Further Assurances .......................................................................................28
Section 6.2        Access; Enforcement; Record Retention ......................................................28
Section 6.3        Employees, Labor Matters, etc.....................................................................28
Section 6.4        Certain Tax Matters .....................................................................................29
Section 6.5        Insurance Matters .........................................................................................30
Section 6.6        Acknowledgements ......................................................................................30
Section 6.7        Press Releases and Public Announcements...................................................31
Section 6.8        Licenses ........................................................................................................31

ARTICLE VII       CONDITIONS TO OBLIGATION TO CLOSE ......................................32
Section 7.1        Conditions to Purchaser's Obligations ........................................................32
Section 7.2        Conditions to Sellers' Obligations................................................................32
Section 7.3        No Frustration of Closing Conditions...........................................................33

ARTICLE VIII      TERMINATION .........................................................................................33
Section 8.1        Termination of Agreement ...........................................................................33
Section 8.2        Effect of Termination ...................................................................................34
Section 8.3        Lease Indemnity ...........................................................................................34

ARTICLE IX        MISCELLANEOUS ....................................................................................34
Section 9.1        Survival.........................................................................................................34
Section 9.2        Expenses .......................................................................................................35
Section 9.3        Entire Agreement..........................................................................................35
Section 9.4        Incorporation of Exhibits and Disclosure Schedule ....................................35
Section 9.5        Amendments and Waivers.............................................................................35
Section 9.6        Succession and Assignment...........................................................................35
Section 9.7        Notices...........................................................................................................35
Section 9.8        Governing Law .............................................................................................36
Section 9.9        Submission to Jurisdiction; Service of Process ...........................................36
Section 9.10       Waiver of Jury Trial......................................................................................37
Section 9.11       Specific Performance....................................................................................37
Section 9.12       Severability....................................................................................................37
Section 9.13       No Third-Party Beneficiaries........................................................................37
Section 9.14       Non-Recourse ...............................................................................................37
Section 9.15       Mutual Drafting ............................................................................................38
Section 9.16       Disclosure Schedule .....................................................................................38
Section 9.17       Headings; Table of Contents.........................................................................39
Section 9.18       Counterparts; Facsimile and Electronic Signatures ....................................39
Section 9.19       Limitations Under Applicable Law ..............................................................39

Exhibit A – Form of Bill of Sale
Exhibit B – Form of Assignment and Assumption Agreement
Exhibit C – Form of Sale Order
Exhibit D – Bidding Procedures

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is entered into as of September 16, 2018 by and (i) Blue Gold Equities LLC, a New York limited liability company ("Blue Gold"), (ii) Central Ave. Market LLC, a New York limited liability company ("Central Avenue") (iii) Amsterdam Ave. Market LLC, a New York limited liability company ("Amsterdam Avenue"), (vi) Wilmot Road Market, LLC, a New York limited liability company ("Wilmot Road"), (v) Seasons Express Inwood LLC, a New York limited liability company ("Inwood"), (vi) Seasons Lakewood, LLC, a New Jersey limited liability company ("Lakewood"), (vii) Seasons Maryland LLC, a Maryland limited liability company ("Maryland"), (viii) Seasons Clifton LLC, a New Jersey limited liability company ("Clifton"), (ix) Seasons Cleveland LLC, an Ohio limited liability company ("Cleveland"), (x) Lawrence Supermarket LLC, a New York limited liability company ("Lawrence"), (xi) Upper West Side Supermarket LLC, a New York limited liability company ("Upper West Side", and collectively with Blue Gold, Central Avenue, Amsterdam Avenue, Wilmot Road, Inwood, Lakewood, Maryland, Clifton, Cleveland and Lawrence the "Operating Entities"), and (xii) Seasons Corporate LLC, a New York limited liability company ("Corporate", and collectively with the Operating Entities, the "Sellers") and SKNY LLC, a New York limited liability company (the "Purchaser"). Sellers and Purchaser are referred to collectively herein as the "Parties".

## WITNESSETH

WHEREAS, Sellers filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on September 16, 2018 in the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court"); and

WHEREAS, Sellers operate the nine (9) supermarkets at the locations set forth in Section 3.5 of the Disclosure Schedule (as defined below) under the name "Seasons" (each a "Store" and, collectively, the "Stores"); and

WHEREAS, Sellers desire to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from Sellers, all of the Acquired Assets (as defined below) and Assumed Liabilities (as defined below), all as more specifically provided herein.

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    Definitions. For purposes of this Agreement:

"Acquired Assets" means all of Sellers' right, title, and interest in and to all of the following assets of Sellers used or held for use exclusively in the operation of the Stores and (to the extent applicable) located at the Stores on the Closing Date:

1

(a)     the Inventory;

(b)     the Furnishings and Equipment owned by Sellers (other than Excluded Furnishings and Equipment);

(c)     to the maximum extent permitted by the Bankruptcy Code and in accordance with the terms herein, the Leases, together with (to the extent of the Sellers' interest therein) the buildings, fixtures and improvements located on or attached to such real property, and all rights arising therefrom, and all tenements, hereditaments, appurtenances and other real property rights appertaining thereto, subject to the rights of the applicable landlord (including rights to ownership or use of such property) under such Leases;

(d)     to the maximum extent permitted by the Bankruptcy Code and in accordance with the terms herein, all rights under those Contracts set forth on Schedule 1.1(a), other than those Contracts that expire or that are terminated prior to the Closing (such Contracts, together with the Leases (the "Transferred Contracts");

(e)     all of Sellers' security deposits, prepaid rent, and prepaid expenses previously paid by Sellers to fulfill Sellers' obligations under the Leases and, to the extent transferable, other deposits by Sellers relating to the Stores under any of the Transferred Contracts (collectively, the "Prepaid Expenses"). For each Lease, the Prepaid Expenses as of the date hereof are listed on Schedule 1.1(b), which Schedule shall be updated three (3) Business Days prior to the Closing Date;

(f)     all Cash Equivalents and accounts receivable (excluding amounts due from credit card companies limited to the amounts due to the Concessions);

(g)     all Causes of Action, including without limitation, Avoidance Actions against any Person who is not an Insider and/or Affiliate of an Insider, other than L&N Consulting Group LLC, SuperSol Ltd., Laurence Garber and Norman Lampert;

(h)     all Permits;

(i)     all Intellectual Property owned, used, or held for use by Sellers, including, for the avoidance of doubt, the names "Seasons" and all other marks set forth on Schedule 1.1(c), any name or trademark, service mark, trade name, logo, trade dress, Internet domain name or other indicia of origin that includes, relates to or derives from any such name, or any related abbreviations, acronyms or other formatives based on any such name, whether alone or in combination with any other words, phrases, or designs, and all registrations, applications and renewals thereof, all rights and goodwill associated therewith and any name or trademark, service mark, trade name, logo, Internet domain name, or other indicia of origin that is confusingly similar thereto or derived therefrom (collectively, the "Seller Marks");

(j)     all files, documents, instruments, papers, computer files, information and

records and all other books and records of Sellers in any media primarily relating to the Acquired Assets, including real property documents, surveys (boundary and topographical), construction drawings, soil reports, all records relating to Liabilities which constitute Assumed Liabilities, asbestos inspections, environmental reports and assessments, fixture plans, personnel records, ledgers, journals, studies, reports, budgets, forecasts, projections and competitive or capital spending analysis of the Stores, and information relating to Taxes (collectively, the "Files and Records");

(k)    Subject to applicable customer protections, all customer data and information derived from branded loyalty promotion or co-branded credit card programs (to the extent in existence) and other similar information related to customer purchases at the Stores; provided, however, if Purchaser determines in its sole discretion to purchase data and records subject to applicable Law regarding privacy related to Sellers' business, the costs of a privacy ombudsman relating solely to such data and records purchased by Purchaser, to the extent that the Bankruptcy Court requires a privacy ombudsman to be appointed, shall be borne equally between Purchaser, on the one hand, and Sellers, on the other hand (and, for the avoidance of doubt, in all other circumstances, the costs of the privacy ombudsman shall not be borne by Purchaser);

(l)    all goodwill of Sellers arising, directly or indirectly, primarily out of the operation or conduct of the Business;

(m)    to the extent transferable, all warranties related to any of the foregoing; and

(n)    without limiting the foregoing, all other business, assets, rights or properties used exclusively in or located at the Stores and not specifically set forth herein.

provided, however, notwithstanding anything to the contrary set forth in this definition, the Acquired Assets shall not include any Excluded Assets.

"Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person, where "control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of another Person, whether through the ownership of voting securities, by contract, or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Allocation Principles" has the meaning set forth in Section 2.8.

"Alternate Transaction" has the meaning set forth in Section 2.4(b).

"Assignment and Assumption Agreement" has the meaning set forth in Section 2.6(b).

"Assumed Liabilities" means all liabilities of each of the Sellers incurred exclusively in the operation of the Stores as of the Closing, including:

(a)    all Liabilities under the Transferred Contracts (inclusive of Cure Costs);

(b)    all Liabilities relating to Gift Cards;

(c)    all amounts allocated to Purchaser under Section 2.8; and

(d)    all Liabilities relating to or arising out of the ownership or operation of the Stores or any Acquired Asset from and after the Closing Date;

provided, however, that notwithstanding anything to the contrary set forth in this definition, the Assumed Liabilities shall not include any Excluded Liabilities.

"Auction" has the meaning set forth in Section 5.4(a).

"Avoidance Actions" means all causes of action of Sellers under Sections 544 through 553 of the Bankruptcy Code with respect to payments or transfers of property made prior to the filing of the Bankruptcy Cases.

"Bankruptcy Cases" means the Chapter 11 cases of Sellers.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bidding Procedures" has the meaning set forth in Section 5.4(a).

"Bidding Procedures Order" means the *Order (A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Scheduling an Auction and a Sale Hearing Related Thereto, (C) Approving the Form and Manner of Notice of the Auction and the Sale Hearing, and (D) Approving Bidding Procedures* entered by the Bankruptcy Court on September [__], 2018 [Docket No. [__]].

"Bill of Sale" has the meaning set forth in Section 2.6(b).

"Bonding Requirements" means standby letters of credit, guarantees, indemnity bonds and other financial commitment credit support instruments issued by third parties on behalf of Sellers or any of their respective Subsidiaries or Affiliates regarding any of the Acquired Assets.

"Breakup Fee" has the meaning set forth in Section 2.4(a).

"Business" means the operation of the Stores by Sellers.

"Business Day" means any day, other than a Saturday, Sunday, Jewish holiday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in the State of New York are authorized or required by Law or other governmental action to close.

4

"Cash Equivalents" means cash, checks, money orders, funds in time and demand deposits or similar accounts, marketable securities, short-term investments, and other cash equivalents and liquid investments.

"Causes of Action" means all claims, causes of action, choses in action, rights of recovery, repayment obligations, rights of setoff and rights of recoupment that Sellers have or may have against any Person.

"Closing" has the meaning set forth in Section 2.5.

"Closing Date" has the meaning set forth in Section 2.5.

"Competing Bid" has the meaning set forth in Section 5.4(a).

"Confidentiality Agreement" means the confidentiality agreement, dated as of September 16, 2018 by and between Sellers and Purchaser.

"Contract" means any agreement, contract, arrangement, commitment, promise, obligation, right, instrument, document or other similar understanding, which in each case is in writing and signed by parties intending to be bound thereby, other than the Leases.

"Contracting Parties" has the meaning set forth in Section 9.14.

"Cure Costs" means all amounts payable in order to cure any monetary defaults required to be cured under section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption by the applicable Seller and assignment to Purchaser of the Transferred Contracts.

"Damages" means any actual losses, claims, liabilities, debts, damages, fines, penalties, or costs (in each case, including reasonable out-of-pocket expenses (including reasonable fees and expenses of counsel)).

"Decree" means any judgment, decree, ruling, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, administrative order, or any other order of any Governmental Authority.

"Deposit" has the meaning set forth in Section 2.3(c).

"DIP Financing Facility" means the debtor-in-possession financing facility approved by the Bankruptcy Court by and between Sellers and SKNY LLC, or another lender.

"Disclosure Schedule" has the meaning set forth in Article III.

"Employee Benefit Plan" means all "employee benefit plans," as defined in section 3(3) of ERISA, including any multiemployer plans as defined in section 3(37) of ERISA, and all other material employee benefit plans or arrangements (other than governmental plans and statutorily

required benefit arrangements), including bonus or incentive plans, deferred compensation arrangements, severance pay, sick leave, vacation pay, disability, medical insurance and life insurance maintained or contributed to by Sellers and their Subsidiaries with respect to Sellers' employees.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Excluded Assets" means all assets of Sellers as of the Closing that are not expressly included in the Acquired Assets, including:

(a)     any asset of Sellers that is (i) not located in the Stores and used or held for use exclusively in the operation of the Stores or (ii) inseparable from any other business of Sellers or any of their Affiliates (other than the operation of the Stores), in each case, including (A) organizational documents, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates, and other documents relating to Sellers' organization, maintenance, existence, and operation; (B) books and records related to (1) Taxes paid or payable by Sellers or (2) any claims, obligations or liabilities not included in Assumed Liabilities; (C) any Tax refund, deposit, prepayment, credit, attribute, or other Tax asset of or with respect to either of the Sellers; and (D) any assets not customarily based or located at the Stores;

(b)     all insurance policies and binders and all claims, refunds and credits from insurance policies or binders due or to become due with respect to such policies or binders;

(c)     all of Sellers' rights under this Agreement or any Related Agreement;

(d)     all of Sellers' rights under any Contracts primarily related to any Excluded Asset;

(e)     [INTENTIONALLY DELETED];

(f)     except as otherwise provided in this Agreement, any other payment, reimbursement, rebate or refund arising from the operation of the Stores prior to the Closing;

(g)     all leased equipment located at or used in the Stores and all in-store processors, direct access storage devices, and electronic funds transfer devices, except any equipment leased pursuant to a Transferred Contract;

(h)     the Furnishings and Equipment described on Schedule 1.1(d);

(i)     all Contracts and Leases other than the Transferred Contracts; and

(j)     those items set forth on Schedule 1.1(e).

"Excluded Liabilities" means the following Liabilities of Sellers:

(a)    any Liability not relating to or arising out of the operation of the Stores or the Acquired Assets, including any Liability exclusively relating to or exclusively arising out of the Excluded Assets;

(b)    any Liability of Sellers for Taxes (except as provided for in Section 2.8);

(c)    all accounts payable;

(d)    all Liabilities of Sellers under this Agreement or any Related Agreement and the transactions contemplated hereby or thereby;

(e)    all Liabilities of Sellers relating to or arising out of the Stores or Acquired Assets prior to the Closing Date not specifically assumed by Purchaser hereunder or by operation of law; and

(f)    all Liabilities of Sellers or any of their respective Subsidiaries or any ERISA Affiliate with respect to any Employee Benefit Plan or any other compensation or benefit plan, program, policy, agreement or arrangement of any such Seller, Subsidiary thereof, or any ERISA Affiliate, including, for the avoidance of doubt, any Liability of Sellers or any of their respective Subsidiaries or any ERISA Affiliate under Title IV of ERISA with respect to any single-employer plan (within the meaning of Section 4001(a)(15) of ERISA) or any multiemployer plan (within the meaning of Section 4001(a)(3) of ERISA).

"Expense Reimbursement" has the meaning set forth in Section 2.4(b).

"Final Order" means an order or judgment, the operation or effect of which is not stayed, and as to which order or judgment (or any revision, modification or amendment thereof), the time to appeal or seek review or rehearing has expired, and as to which no appeal or petition for review or motion for re-argument has been taken or been made and is pending for argument.

"Furnishings and Equipment" means all trade fixtures, store models, shelving, and refrigeration equipment owned by Sellers and located at the Stores, including those items listed on Schedule 1.1(f).

"GAAP" means United States generally accepted accounting principles consistently applied.

"Governmental Authority" means any federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity.

"Insider" as defined in section 101(31) of the Bankruptcy Code.

7

"Inventory" means all food, beverages and other merchandise and products (including general merchandise items described in Schedule 1.1(g) but excluding [alcohol]) and offered for sale to customers at the Stores.

"Knowledge" of Sellers (and other words of similar import) means the actual knowledge of persons holding a position of senior vice president or senior thereto at Sellers. "Knowledge" of Purchaser (and other words of similar import) means the actual knowledge of persons holding a position of senior vice president or senior thereto at Purchaser.

"Law" means any constitution applicable to, and any statute, treaty, code, rule, regulation, ordinance, or requirement of any kind of, any Governmental Authority.

"Leases" means all leases, subleases, licenses, concessions, options (including lease renewal options), contracts, extension letters, easements, reciprocal easements, assignments, termination agreements, subordination agreements, non-disturbance agreements, estoppel certificates and other agreements (written or oral), and any amendments or supplements to the foregoing, and recorded memoranda of any of the foregoing, pursuant to which any Seller holds any leasehold or subleasehold estates and other rights of use and occupancy of any Store.

"Liability" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether determined, determinable or otherwise, whether directly incurred, absolute or contingent, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due) regardless of when arising.

"Lien" means any mortgage, pledge, lien, charge, security interest, option, right of first refusal, easement, security agreement or other encumbrance or restriction on the use or transfer of any property; provided, however, that "Lien" shall not be deemed to include any license of Intellectual Property.

"Litigation" means any action, cause of action, suit, claim, charge, investigation, audit, demand, hearing or proceeding, whether civil, criminal, administrative, or arbitral, whether at law or in equity (including actions or proceedings seeking injunctive relief) and whether before any Governmental Authority.

"Loan Documents" has the meaning set forth in Section 2.3(b).

"Material Adverse Effect" means any effect or change that has a material adverse effect on the condition of the Acquired Assets, taken as a whole, other than any effects or changes arising from or related to: (a) general business or economic conditions in any of the geographical areas in which the Stores operate; (b) any condition or occurrence affecting retail grocery generally; (c) national or international political or social conditions, including the engagement by any country in hostilities, whether commenced before or after the date hereof and whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack; (d) financial, banking, or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index); (e) the occurrence of any act of God or other

calamity or force majeure events (whether or not declared as such), including civil disturbance, embargo, natural disaster, fire, flood, hurricane, tornado, or other weather event; (f) changes in Law or accounting rules; (g) the taking of any action contemplated by this Agreement or any Related Agreement or taken with the consent of the other Party; (h) any effects or changes as a result of the announcement or pendency of this Agreement; (i) the sale of any other assets or stores to any third parties by any Seller or any of its Affiliates; (j) any effects or changes arising from or related to the breach of the Agreement by Purchaser; (k) the failure of Sellers to obtain any consent, permit, authorization, waiver or approval required in connection with the transactions contemplated hereby; (l) any strike or labor dispute, (m) any items set forth in the Disclosure Schedule; (n) any effect resulting from the filing of the Bankruptcy Cases; or (o) any matter of which Purchaser is aware on the date hereof.

"Non-Party Affiliates" has the meaning set forth in Section 9.14.

"Ordinary Course of Business" means the ordinary and usual course of normal day to day operations of the Business through the date hereof consistent with past practice.

"Outside Date" has the meaning set forth in Section 8.1(b)(ii).

"Parties" has the meaning set forth in the preamble.

"Permit" means any franchise, approval, permit, license, order, registration, certificate, variance or similar right obtained from any Governmental Authority.

"Permitted Lien" means (a) Liens for Taxes not yet delinquent or which are being contested in good faith by appropriate proceedings; (b) mechanic's, workmen's, repairmen's, warehousemen's, carrier's or other similar Liens, including all statutory liens, arising or incurred in the Ordinary Course of Business, that in each case have been bonded over or otherwise secured in a manner acceptable to Purchaser in Purchaser's reasonable discretion; (c) with respect to leased or licensed real or personal property, the terms and conditions of the lease, license, sublease or other occupancy agreement applicable thereto; (d) with respect to real property, zoning, building codes and other land use laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such real property; (e) easements, covenants, conditions, restrictions and other similar matters affecting title to real property and other encroachments and title and survey defects that do not or would not reasonably be expected to have a Material Adverse Effect; (f) matters that would be disclosed on an accurate survey of the real property; (g) any liens shown in any title commitment, report or policy, or otherwise of record; (h) any other Liens that Purchaser has expressly stated are acceptable to Purchaser in a writing delivered to Sellers; and (i) other than any of the Liens set forth in the foregoing clauses (a) through (h) and other than any Lien that is required to be removed or cured by the applicable tenant under the applicable Lease or was created by such tenant, any Liens on the fee property underlying any Lease that do not or would not reasonably be expected to adversely affect the current occupancy or use of such real property in any material respect or impose any material adverse obligations on Purchaser following the applicable Closing.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or any

other entity, including any Governmental Authority or any group of any of the foregoing.

"Pre-Closing Period" has the meaning set forth in Section 6.4(c).

"Prepaid Expenses" has the meaning set forth in the definition of Acquired Assets.

"Prorated Charges" has the meaning set forth in Section 2.9(a).

"Proration Period" has the meaning set forth in Section 6.4(b).

"Purchase Price" has the meaning set forth in Section 2.3(a).

"Purchase Price Allocation" has the meaning set forth in Section 2.8.

"Purchaser Proration Amount" has the meaning set forth in Section 2.9(a).

"Purchaser" has the meaning set forth in the preamble.

"Related Agreements" means the Bill of Sale and the Assignment and Assumption Agreement.

"Representative" means, when used with respect to a Person, the Person's controlled Affiliates (including Subsidiaries) and such Person's and any of the foregoing Persons' respective officers, directors, managers, members, shareholders, partners, employees, agents, representatives, advisors (including financial advisors, bankers, consultants, legal counsel, and accountants), and financing sources.

"Sale Motion" means the motion filed in the Bankruptcy Court on behalf of Sellers, for among other things, approval of the notice of auction and sale hearing, Bidding Procedures and bidding protections, including the Breakup Fee and Expense Reimbursement, the sale of the Acquired Assets to Purchaser and the assignment by Sellers, and assumption by Purchaser, of the Transferred Contracts.

"Sale Order" means an order of the Bankruptcy Court in substantially the form attached hereto as Exhibit C (a) approving (i) this Agreement and the execution, delivery, and performance by Sellers of this Agreement and the other instruments and agreements contemplated hereby; (ii) the sale of the Acquired Assets to Purchaser free and clear of all Liens, other than any Permitted Liens or any Assumed Liabilities; (iii) the assumption of the Assumed Liabilities by Purchaser on the terms set forth herein; and (iv) the assumption and assignment to Purchaser of the Transferred Contracts on the terms set forth herein; (b) determining that Purchaser is a good faith purchaser; and (c) providing that the Closing will occur in accordance with the terms and conditions hereof.

"Seasons" has the meaning set forth in the preamble.

"Seller Marks" has the meaning set forth in the definition of Acquired Assets.

"Seller Proration Amount" has the meaning set forth in Section 2.9(a).

"Sellers" has the meaning set forth in the preamble.

"Stores" has the meaning set forth in the recitals.

"Subsidiary" means, with respect to any Person, means, on any date, any Person (a) the accounts of which would be consolidated with and into those of the applicable Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date or (b) of which securities or other ownership interests representing more than fifty percent of the equity or more than fifty percent (50%) of the ordinary voting power or, in the case of a partnership, more than fifty percent (50%) of the general partnership interests or more than fifty percent of the profits or losses of which are, as of such date, owned, controlled or held by the applicable Person or one or more subsidiaries of such Person.

"Tax" or "Taxes" means any United States federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, stamp, occupation, premium, windfall profits, environmental (including taxes under section 59A of the IRC), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether disputed or not.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Transfer Tax" has the meaning set forth in Section 6.4(a).

"Transferred Contracts" has the meaning set forth in the definition of Acquired Assets and, without limiting the preceding, shall include the Leases.

Section 1.2    Interpretations. Unless otherwise indicated herein to the contrary:

(a)    When a reference is made in this Agreement to an Article, Section, Exhibit, Schedule, clause or subclause, such reference shall be to an Article, Section, Exhibit, Schedule, clause or subclause of this Agreement.

(b)    The words "include," "includes" or "including" and other words or phrases of similar import, when used in this Agreement, shall be deemed to be followed by the words "without limitation."

(c)    The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement.

(d)    The word "if" and other words of similar import shall be deemed, in each case, to

be followed by the phrase "and only if."

    (e)    The use of "or" herein is not intended to be exclusive.

    (f)    The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa.

    (g)    All terms defined in this Agreement have their defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein.

    (h)    References herein to a Person are also to its successors and permitted assigns. Any reference herein to a Governmental Authority shall be deemed to include reference to any successor thereto.

    (i)    Any reference herein to "Dollars" or "$" shall mean United States dollars.

    (j)    Purchaser acknowledges and agrees that the specification of any dollar amount in the representations, warranties, or covenants contained in this Agreement is not intended to imply that such amounts or higher or lower amounts are or are not material, and Purchaser shall not use the fact of the setting of such amounts in any dispute or controversy between the Parties as to whether any obligation, item, or matter is or is not material.

    (k)    References in this Agreement to materials or information "furnished to Purchaser" and other phrases of similar import include all materials or information made available to Purchaser or its Representatives or provided to Purchaser or its Representatives in response to requests for materials or information.

## ARTICLE II
## PURCHASE AND SALE

    Section 2.1    <u>Purchase and Sale of Assets</u>. On the terms and subject to the conditions set forth in this Agreement, Purchaser will purchase from Sellers, and Sellers will sell, transfer, assign, convey, and deliver to Purchaser at the Closing all of the Acquired Assets.

    Section 2.2    <u>Assumed Liabilities</u>. On the terms and subject to the conditions set forth in this Agreement, Purchaser will assume and become responsible for the Assumed Liabilities at the Closing. Purchaser agrees to pay, perform, honor, and discharge, or cause to be paid, performed, honored and discharged, all Assumed Liabilities in a timely manner in accordance with the terms thereof.

    Section 2.3    <u>Consideration; Deposit</u>.

(a)    The consideration for the Acquired Assets at and including the Stores, including the Inventory, shall be an aggregate Dollar amount equal to the sum of (A) $12,000,000 *plus* (B) the amount of the Prepaid Expenses, *plus* (C) the Seller Proration Amount, if any, *minus* (D) the Purchaser Proration Amount, if any (such calculation, the "Purchase Price").

(b)    Subject to the terms and conditions hereof, on the Closing Date, Purchaser shall pay to Sellers the amount of the Purchase Price *less* an amount equal to the entire outstanding principal amount and accrued interest, and all other outstanding payment obligations, under (i) (A) that certain Amended and Restated Promissory Note between, among others, certain Sellers, as borrowers, and SKNY, as lender, dated March 6, 2018, and (B) that certain Second Amended and Restated Promissory Note between among others, certain Sellers, as borrowers, and SKNY, as lender, dated September 5, 2018 (collectively, the "Prepetition Secured Loan Documents") and (ii) any subsequently entered into loan and security agreement and promissory note evidencing DIP financing provided by SKNY to Sellers (together with the Prepetition Secured Loan Documents, the "Loan Documents"), which will be terminated and deemed paid in full as of the Closing.

(c)    Upon the execution of this Agreement, Purchaser shall be deemed to have made a cash deposit in the amount of $1,200,000 on account of the Prepetition Secured Loan Documents (the "Deposit"). The Deposit shall be liquidated damages, available to Sellers as their sole remedy, if this Agreement is properly terminated by Sellers pursuant to section 8.1(m) or upon the failure of Purchaser to consummate the Sale, provided that all conditions precedent to Closing have been satisfied and there shall not have been a material breach by Sellers of any representation, warranty or covenant contained in this Agreement or the Loan Documents.

Section 2.4    Breakup Fee and Expense Reimbursement.

(a)    In the event that the Bankruptcy Court enters a Final Order approving an Alternate Transaction, then Purchaser shall be entitled to and Sellers shall pay to Purchaser at the consummation of an Alternate Transaction 3.0% of the Purchase Price allocated above to such Store (the "Breakup Fee"). The Breakup Fee provided for by this Section is intended to cover opportunity costs incurred by Purchaser in pursuing and negotiating this Agreement and the transactions contemplated hereby, and is considered by the Parties to be reasonable for such purposes. The Breakup Fee shall be paid from the first sale proceeds of an Alternate Transaction. The claims of Purchaser to the Breakup Fee shall constitute an administrative expense against Sellers' bankruptcy estates under the applicable provisions of the Bankruptcy Code.

(b)    In addition to any Breakup Fee that may be payable pursuant to this Section 2.4, upon (i) any event in which the Breakup Fee is payable pursuant to this Section or (ii) termination of this Agreement by Purchaser pursuant to Sections 8.1, other than Section 8.1(m), Sellers shall reimburse the actual and necessary expenses, including reasonable attorney's fees, incurred in connection with negotiation and entry into this Agreement, due diligence with respect to the transactions contemplated by this Agreement, and obtaining

Bankruptcy Court approval of this Agreement, in an amount not to exceed $150,000 (the "Expense Reimbursement"). The claims of Purchaser to the Expense Reimbursement shall constitute an administrative expense against Sellers' bankruptcy estates under the applicable provisions of the Bankruptcy Code. "Alternate Transaction" means (a) a merger, consolidation, restructuring, reorganization, plan of reorganization in the Bankruptcy Cases, joint venture, refinancing, funding of a plan of reorganization in the Bankruptcy Cases, business combination, transaction or series of transactions involving the sale or other disposition (including, without limitation, by lease, foreclosure, transfer in lieu of foreclosure, or management agreement) of all or any part of Sellers, the Business, the Acquired Assets pursuant to one or more transactions to a Person other than Purchaser; (b) the sale of outstanding or newly issued (or some combination of sold and newly issued) capital stock of Sellers (including by way of a debt for equity swap, tender offer, foreclosure or plan of reorganization or liquidation) resulting in a transfer of voting control of Sellers to a Person or group of Persons who, before the transaction or series of transactions, did not hold voting control of Sellers; (c) the dismissal of the Bankruptcy Cases, converting the Bankruptcy Cases to Chapter 7 cases or if Sellers file a motion or other pleading seeking the dismissal or conversion of the Bankruptcy Cases under Section 1112 of the Bankruptcy Code or otherwise prior to the Closing, or (d) the appointment of a Chapter 7 trustee or an examiner with expanded powers in the Bankruptcy Cases prior to the Closing.

(c)     The provisions of this Section 2.4 shall survive the closing or earlier termination of the transactions contemplated hereby.

Section 2.5     Closing. The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Zeichner Ellman & Krause LLP, located at 1211 Avenue of the Americas, 40th Floor, New York, New York 10036 (or such other location as shall be mutually agreed upon by Sellers and Purchaser) commencing at 10:00 a.m. local time on a date (the "Closing Date") that is the third (3rd) Business Day following the date upon which all of the conditions to the obligations of Sellers and Purchaser to consummate the transactions contemplated hereby set forth in Article VII (other than conditions that by their nature are to be satisfied at the Closing itself, but subject to the satisfaction or waiver of those conditions) have been satisfied or waived, or on such other date as shall be mutually agreed upon by Sellers and Purchaser prior thereto. For purposes of this Agreement and the transactions contemplated hereby, the Closing will be deemed to occur and be effective, and title to and risk of loss associated with the Acquired Assets, shall be deemed to occur at 12:01 am, New York City time, on the Closing Date. The Closing Date shall occur no later than December 31, 2018, unless extended by Purchaser in its sole discretion.

Section 2.6     Closing Payments and Deliveries.

(a)     On the Closing Date, Purchaser shall pay the Purchase Price to Sellers (less the amounts set forth in Section 2.3), which shall be paid by wire transfer of immediately available funds into an account designated by Sellers.

(b)     Subject to Section 2.3(B), at the Closing, Sellers shall be required to use the

14

proceeds of the Purchase Price to satisfy in full the Sellers' obligations under the DIP Financing Facility.

(c)     At the Closing, Sellers will deliver to Purchaser (i) a duly executed Bill of Sale substantially in the form of Exhibit A (the "Bill of Sale"); (ii) a duly executed Assignment and Assumption Agreement substantially in the form of Exhibit B (the "Assignment and Assumption Agreement"); and (iii) a duly executed certificate from an officer of each Seller to the effect that each of the conditions specified in Section 7.1(a) and Section 7.1(b) is satisfied.

(d)     At the Closing, Purchaser will deliver to Sellers (i) the Bill of Sale duly executed by Purchaser; (ii) the Assignment and Assumption Agreement duly executed by Purchaser; and (iii) a duly executed certificate from an officer of Purchaser to the effect that each of the conditions specified in Section 7.2(a) and Section 7.2(b) are satisfied; and (iv) the executed originals of each of the Leases to the extent in Sellers' possession.

Section 2.7     Intentionally Deleted.

Section 2.8     Allocation.     Purchaser and Sellers agree to allocate the Purchase Price (as finally determined hereunder) and all other relevant items among the Acquired Assets in accordance with section 1060 of the IRC and the Treasury Regulations thereunder (the "Allocation Principles"). No later than sixty (60) days after the Closing Date, Sellers shall deliver to Purchaser an allocation of the Purchase Price and the Assumed Liabilities (and all other relevant items) as of the Closing Date among the Acquired Assets determined in a manner consistent with the Allocation Principles (the "Purchase Price Allocation") for Purchaser's review and comment. Any reasonable comments provided by Purchaser to the Sellers under this Section 2.8 shall be considered by the Sellers in good faith. The Purchase Price Allocation (inclusive of any reasonable comments accepted by the Sellers) shall be conclusive and binding on the parties, and Purchaser and Sellers agree (and agree to cause their respective subsidiaries and Affiliate) to prepare, execute, and file IRS Form 8594 and all Tax Returns on a basis consistent with the Purchase Price Allocation. None of the Parties will take any position inconsistent with the Purchase Price Allocation on any Tax Return or in any audit or Tax proceeding, unless otherwise required by a final determination by a Governmental Authority. For the avoidance of doubt, the Parties shall cooperate in determining the portion of the Purchase Price allocable to the Acquired Assets that are subject to a Transfer Tax prior to the due date of the Tax Return required to be filed in connection with such Transfer Taxes; provided, that if the Parties do not agree with respect to such determination, such matter shall be resolved in accordance with the process outlined in this Section 2.8, provided further, that such Tax Return shall be amended if the Purchase Price Allocation is subsequently adjusted pursuant to the procedures described above. Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 2.8 shall survive the Closing without limitation.

Section 2.9     Proration.

(a)     On the Closing Date all monthly payments for the month in which the Closing occurs (including base rent, common area maintenance fees, and utility charges)

15

under the Leases transferred at the Closing (the "Prorated Charges") shall be apportioned and prorated between Sellers and Purchaser as of the Closing Date with (i) Purchaser bearing the expense of Purchaser's proportionate share of such Prorated Charges that shall be equal to the product obtained by multiplying (A) a fraction, the numerator being the amount of the Prorated Charges under the applicable Lease and the denominator being the total number of days in the lease month in which the Closing occurs, times (B) the number of days in such lease month following the day that immediately precedes the Closing Date and paying such amount to Sellers to the extent payment for such Prorated Charges has been made by Sellers prior to the Closing, and (ii) Sellers bearing the remaining portion of such Prorated Charges (and paying the amounts thereof to Purchaser to the extent payment for such Prorated Charges has not been previously made by Sellers). The net amount of all Prorated Charges owed to Purchaser and Sellers under this shall be referred to as the "Purchaser Proration Amount" if owed to Purchaser or the "Seller Proration Amount" if owed to Sellers. Except as set forth in this Section 2.9, no amounts paid or payable under or in respect of any Acquired Asset or group of Acquired Assets shall be apportioned and prorated between Sellers and Purchaser. Notwithstanding the foregoing there shall be no apportionment nor reduction in Purchase Price for percentage rents, if any.

(b)    Real estate taxes and assessments and water and sewer charges shall be adjusted in the manner set forth in Section 6.4.

(c)    As to all non-monthly real estate related payments, the same shall be apportioned between Sellers and Purchaser as of 12:01 a.m. on the Closing Date. If any amounts are payable in installments, all installments due through the Closing together with the accrued but unpaid portion of any other installments not yet due as of the Closing shall be prorated based on the periods of time covered by such installments occurring before and after the Closing Date.

(d)    If any of the items subject to apportionment under the foregoing provisions cannot be apportioned at the Closing because of the unavailability of the information necessary to compute such apportionment, or if any errors or omissions in computing apportionments at the Closing are discovered subsequent to the Closing, then such item shall be reapportioned and such errors and omissions corrected as soon as practicable after the Closing Date and the proper party reimbursed, provided, however, that such apportionment must occur within sixty (60) days from and after the Closing Date.

Section 2.10    Removal of Excluded Assets. As promptly as practicable following the Closing Date (and in any event within fifteen (15) Business Days), Purchaser shall allow Sellers to remove at Sellers' sole cost and expense all Excluded Assets that are located at the Stores and, if requested by Sellers, Purchaser shall arrange transportation of such Excluded Assets to a location designated by Sellers at Sellers' sole cost and expense.

## ARTICLE III
## SELLERS' REPRESENTATIONS AND WARRANTIES

Sellers represent and warrant to Purchaser that, to the best of their knowledge and belief,

the statements contained in this <u>Article III</u> are true and correct as of the date of this Agreement, except as (i) set forth in the disclosure schedule accompanying this Agreement (the "<u>Disclosure Schedule</u>") or (ii) disclosed in any forms, statements, or other documents filed with the Bankruptcy Court.

Section 3.1    <u>Organization of Sellers; Good Standing</u>. Each Seller is a corporation or limited liability company, as applicable, duly organized, validly existing and in good standing under the laws of the state of its formation. Each Seller has, subject to the necessary authority from the Bankruptcy Court, all requisite corporate or other organizational power and authority to own, lease and operate its assets and to carry on its business as now being conducted, except where the failure to be so organized, existing, or in good standing or have such power and authority would not reasonably be expected to have a Material Adverse Effect.

Section 3.2    <u>Authorization of Transaction</u>. Subject to the Bankruptcy Court's entry of the Sale Order and any other necessary order to close the sale of the Acquired Assets, each Seller has full power and authority (including full corporate or other organizational power and authority) to execute and deliver this Agreement and all other agreements contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder. The execution, delivery, and performance of this Agreement and all other agreements contemplated hereby to which each Seller is a party have been duly authorized by such Seller. Upon due execution hereof by each Seller, this Agreement (assuming due authorization and delivery by Purchaser) shall constitute, subject to the Bankruptcy Court's entry of the Sale Order and any other necessary order to close the sale of the Acquired Assets, the valid and legally binding obligation of such Seller, enforceable against such Seller in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar laws relating to creditors' rights and general principles of equity.

Section 3.3    <u>Noncontravention; Government Filings</u>. Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in <u>Article II</u>), will (a) conflict with or result in a breach of the organizational documents of any Seller, (b) subject to the entry of the Sale Order and any other necessary order to close the sale of the Acquired Assets, materially violate any law or Decree to which any Seller is subject in respect of the Acquired Assets, or (c) subject to the entry of the Sale Order and any other necessary order to close the sale of the Acquired Assets, result in a material breach of, constitute a material default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any material Contract to which any Seller is a party or to which any of the Acquired Assets is subject, except, in the case of either clause (b) or (c), for such conflict, violations, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Other than as required or pursuant to the Bankruptcy Code, the Sale Order and any other necessary order to close the sale of the Acquired Assets, no Seller is required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order for the Parties to consummate the transactions contemplated by this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or

prevent or materially impair or delay any Seller's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 3.4    Title to Assets. At the Closing, subject to any Permitted Liens, Sellers will have good and valid title to, or the right to use, the tangible Acquired Assets except to the extent the failure to have such title or right to use would not be expected to have a Material Adverse Effect. Pursuant to the Sale Order, Sellers will convey such title to or rights to use, all of the tangible Acquired Assets, free and clear of all Liens (other than Permitted Liens).

Section 3.5    Real Property. Section 3.5 of the Disclosure Schedule sets forth the location of each Store, each of which is leased to a Seller by a third party, and a list of all Store lease agreements and related amendments. Sellers have made available to Purchaser a true and complete copy of each Lease to the extent in their possession. With respect to each Lease, (a) assuming due authorization and delivery by the other party thereto, such Lease constitutes the valid and legally binding obligation of the Seller party thereto and, to Sellers' Knowledge, the counterparty thereto, enforceable against such Seller and, to Sellers' Knowledge, the counterparty thereto in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar laws relating to creditors' rights and general principles of equity, and (b) neither such Seller nor, to Sellers' Knowledge, the counterparty thereto is in material breach or material default under such Lease, except (i) for those defaults that will be cured in accordance with the Sale Order or waived in accordance with section 365 of the Bankruptcy Code (or that need not be cured under the Bankruptcy Code to permit the assumption and assignment of the Leases) or (ii) to the extent such breach or default would not reasonably be expected to have a Material Adverse Effect. To Sellers' Knowledge, there are no subleases at the Stores to which any Seller is sublessor.

Section 3.6    Litigation; Decrees. Except as set forth in Section 3.6 of the Disclosure Schedule and other than the Bankruptcy Cases, there is no Litigation pending or, to the Knowledge of Sellers, threatened, that (a) would reasonably be expected to have a Material Adverse Effect or (b) challenges the validity or enforceability of this Agreement or seeks to enjoin or prohibit consummation of the transactions contemplated hereby. Other than the Bankruptcy Cases, no Seller is subject to any outstanding Decree that would (a) reasonably be expected to have a Material Adverse Effect or (b) prevent or materially delay such Seller's ability to consummate the transactions contemplated hereby or perform in any material respect its obligations hereunder.

Section 3.7.    Intentionally Deleted.

Section 3.8    Brokers' Fees. Except as provided in their engagement agreement with Getzler Henrich & Associates LLC, no Seller has entered into any Contract to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated hereby for which Purchaser could become liable or obligated to pay.

Section 3.9    [INTENTIONALLY DELETED]

Section 3.10    Compliance with Laws; Permits.

18

(a)    Sellers are in compliance with all Laws applicable to the Business, except where the failure to be in compliance would not be reasonably expected to result in a Material Adverse Effect. Sellers have not received any written notice of or been charged with the violation of any Laws, except where such violation would not be reasonably expected to result in a Material Adverse Effect.

(b)    Sellers have all Permits which are required for the operation of the Business as presently conducted, except where the absence of which would not be reasonably expected to result in a Material Adverse Effect. Sellers are not in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of any Permit to which they are parties, except where such default or violation would not be reasonably expected to result in a Material Adverse Effect.

Section 3.11    Disclaimer of Other Representations and Warranties. Except for the representations and warranties contained in this Article III (as modified by the Disclosure Schedule) or expressly contained in any Related Agreement, neither Sellers nor any other Person shall be deemed to have made any representation or warranty, express or implied, including as to the accuracy or completeness of any information regarding Sellers, any Acquired Assets, any Assumed Liabilities or any other matter. Notwithstanding anything herein to the contrary, but without limitation of any representation or warranty expressly contained in this Article III or any Related Agreement, SELLERS MAKE NO OTHER (AND HEREBY DISCLAIM EACH OTHER) REPRESENTATION, WARRANTY, OR GUARANTY WITH RESPECT TO THE VALUE, CONDITION, OR USE OF THE ACQUIRED ASSETS, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. PURCHASER ACKNOWLEDGES THAT, SHOULD THE CLOSING OCCUR, PURCHASER WILL ACQUIRE THE ACQUIRED ASSETS AND ASSUME THE ASSUMED LIABILITIES IN AN "AS IS" CONDITION AND ON A "WHERE IS" BASIS, WITHOUT ANY REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED (INCLUDING ANY WITH RESPECT TO ENVIRONMENTAL, HEALTH, OR SAFETY MATTERS). Sellers disclaim all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser by any director, officer, employee, agent, consultant, or representative of Sellers or any of their Affiliates).

## ARTICLE IV
## PURCHASER'S REPRESENTATIONS AND WARRANTIES

Purchaser represents and warrants to each Seller that the statements contained in this Article IV are true and correct as of the date of this Agreement.

Section 4.1    Organization of Purchaser; Good Standing. Purchaser is a limited liability company  duly organized, validly existing, and in good standing under the laws of the State of New York and has all requisite corporate or similar power and authority to own, lease,

and operate its assets and to carry on its business as now being conducted.

Section 4.2    Authorization of Transaction. Purchaser has full power and authority (including full corporate or other entity power and authority) to execute and deliver this Agreement and all other agreements contemplated hereby to which it is a party and to perform its obligations hereunder and thereunder. The execution, delivery, and performance of this Agreement and all other agreements contemplated hereby to which Purchaser is a party have been duly authorized by Purchaser. This Agreement (assuming due authorization and delivery by Sellers) constitutes the valid and legally binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium, or other similar laws relating to creditors' rights and general principles of equity.

Section 4.3    Noncontravention. Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in Article II) will (a) conflict with or result in a breach of the certificate of incorporation or bylaws, or other organizational documents, of Purchaser, (b) violate any law or Decree to which Purchaser is, or its assets or properties are, subject or (c) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any Contract to which Purchaser is a party or by which it is bound, except, in the case of either clause (b) or (c), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, have a material adverse effect on Purchaser. Purchaser is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order for the Parties to consummate the transactions contemplated by this Agreement or any Related Agreement, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, prevent or materially impair or delay Purchaser's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 4.4    Litigation; Decrees. There is no Litigation pending or, to Purchaser's Knowledge, threatened in writing that challenges the validity or enforceability of this Agreement or seeks to enjoin or prohibit consummation of the transactions contemplated hereby. Neither Purchaser nor any of its Subsidiaries is subject to any outstanding Decree that would prevent or materially impair or delay Purchaser's ability to consummate the transactions contemplated hereby or perform its obligations hereunder on a timely basis.

Section 4.5    Brokers' Fees. Purchaser has not entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which Sellers or any of their Affiliates could become liable or obligated to pay.

Section 4.6    Sufficient Funds. Purchaser has or on the Closing Date shall have the resources and capabilities (financial or otherwise), including immediately available funds, to consummate the Closing on the Closing Date and otherwise perform its obligations hereunder,

Section 4.7    Adequate Assurances. Purchaser is and shall be capable of satisfying

the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Transferred Contracts and the related Assumed Liabilities.

## ARTICLE V
## PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

Section 5.1    Efforts; Cooperation.

(a)    Upon the terms and subject to the conditions set forth in this Agreement, each of the Parties shall use (except as otherwise set forth in Section 5.3) its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper, or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby (including by giving, or causing to be given, any notices to, making any filings with, and using commercially reasonable efforts to obtain any consents of Governmental Authorities, as applicable, as are necessary and appropriate to consummate the transactions contemplated hereby). Without limiting the generality of the foregoing, (i) each Seller shall use its commercially reasonable efforts to cause the conditions set forth in Section 7.1 that are within its control or influence to be satisfied or fulfilled, (ii) Purchaser shall use its commercially reasonable efforts to cause the conditions set forth in Section 7.2 that are within its control or influence to be satisfied or fulfilled, and (iii) in the event the Bankruptcy Court requires a consumer privacy ombudsman to be appointed in connection with the transactions contemplated by this Agreement, Purchaser shall provide any cooperation reasonably required by such ombudsman and shall use commercially reasonable efforts to take all reasonable actions recommended by such ombudsman in any report provided to the Bankruptcy Court.

(b)    Without limiting the generality of Section 5.1(a), neither Party shall take any action, or permit any of its Subsidiaries to take any action, to materially diminish the ability of any Party to consummate, or materially delay any Party's ability to consummate, the transactions contemplated hereby, including any action that is intended or would reasonably be expected to result in any of the conditions to any Party's obligations to consummate the transactions contemplated hereby set forth in Article VII to not be satisfied.

Section 5.2    Conduct of the Business Pending the Closing.

(a)    Prior to the Closing, except (i) as set forth on Section 5.2(a) of the Disclosure Schedule, (ii) as required by applicable Law or by order of the Bankruptcy Court, (iii) as otherwise expressly contemplated by this Agreement or (iv) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed), each Seller shall (A) conduct the Business only in the Ordinary Course of Business and (B) use its commercially reasonable efforts to (1) preserve the

present business operations, organization and goodwill of the Business, and (2) preserve the present relationships with material vendors and suppliers of the Business.

(b)    Except (i) as set forth on <u>Section 5.2(b)</u> of the Disclosure Schedule, (ii) as required by applicable Law or by order of the Bankruptcy Court, (iii) as otherwise contemplated by this Agreement or (iv) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed), no Seller shall, solely as it relates to the Business:

(i)    other than in the Ordinary Course of Business or as required by applicable Law or pursuant to any Contract or policy in effect as of the date of this Agreement, (A) materially increase the annual level of compensation of any Covered Employee or (B) materially increase the coverage or benefits available under any (or create any new) Employee Benefit Plan;

(ii)    subject any of the Acquired Assets to any Lien, except for Permitted Liens and any Lien securing any debtor in possession loan facility or granted in an order authorizing use of cash collateral;

(iii)    other than in the Ordinary Course of Business, sell, transfer, assign, license, sub-license, or otherwise dispose of any Acquired Asset;

(iv)    other than in the Ordinary Course of Business, remove any tangible Acquired Asset from the Stores; or

(v)    agree to do anything prohibited by this <u>Section 5.2</u>.

Section 5.3    <u>Intentionally Deleted</u>.

Section 5.4    <u>Bankruptcy Court Matters</u>.

(a)    <u>Bidding Procedures Order</u>.    This Agreement is subject to approval by the Bankruptcy Court in accordance with the Bidding Procedures Order and the consideration by Sellers of higher or better competing bids in respect of all or any part of the Acquired Assets in accordance with the bidding procedures attached hereto as <u>Exhibit D</u> (the "<u>Bidding Procedures</u>") (whether in combination with other assets of the Sellers or their Affiliates or otherwise) (each a "<u>Competing Bid</u>") and an auction to be conducted in accordance with the Bidding Procedures (the "<u>Auction</u>"). From the date hereof (and any prior time) and until the transactions contemplated hereby are consummated, Sellers are permitted to and to cause their Representatives and Affiliates to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates and Representatives) in connection with a Competing Bid, including, to (and to cause their Representatives and Affiliates to) respond to any inquiries or offers to purchase all or any part of the Acquired Assets, (including supplying information relating to the Business and the assets of Sellers to prospective purchasers).

22

(b)    Sale Order.    Provided Purchaser is selected as the winning bidder in respect of the Acquired Assets at the Auction, or if no Competing Bid is submitted with respect to the Acquired Assets, Sellers shall seek entry of the Sale Order and any other necessary orders of the Bankruptcy Court to close the sale of the Acquired Assets in accordance with the terms and conditions of the Bidding Procedures Order. Purchaser and Sellers understand and agree that the consummation of the transactions contemplated by this Agreement is subject to approval by the Bankruptcy Court. Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order including a finding of adequate assurance of future performance by Purchaser, including by furnishing affidavits or other documents or information for providing the adequate assurance information as required by the Bidding Procedures Order, and filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code. Purchaser shall not, without the prior written consent of Sellers, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Acquired Assets hereunder. In the event the entry of the Sale Order is appealed, Sellers shall use commercially reasonable efforts to defend such appeal.

(i)    Sellers shall file such motions or pleadings as may be appropriate or necessary to assume and assign the Transferred Contracts and to determine the amount of the Cure Costs; provided, that nothing herein shall preclude Sellers from filing such motions, including upon commencement of the Bankruptcy Cases, to reject any Contracts that are not Transferred Contracts.

(c)    Back-up Bidder. Purchaser agrees that, in the event that Purchaser is not the winning bidder at the Auction, if and only if Purchaser is notified that its bid at the Auction or the terms of this Agreement constitute the next highest or best bid for the applicable Acquired Assets (for the avoidance of doubt, on a Store by Store basis), Purchaser shall be the Back-Up Bidder (as defined in the Bidding Procedures) and shall comply with the obligations of a Back-Up Bidder set forth in the Bidding Procedures.

Section 5.5    Notice of Developments. Each Seller and Purchaser will give prompt written notice to the other Parties of (a) the existence of any fact or circumstance, or the occurrence of any event, of which it has Knowledge that would reasonably be likely to cause a condition to a Party's obligations to consummate the transactions contemplated hereby set forth in Article VII not to be satisfied as of a reasonably foreseeable Closing Date, or (b) the receipt of any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; provided, however, that the delivery of any such notice pursuant to this Section 5.5 shall not be deemed to amend or supplement this Agreement and the failure to deliver any such notice shall not constitute a waiver of any right or condition to the consummation of the transactions contemplated hereby by any Party.

Section 5.6    Access; No Contact. Upon the reasonable request of Purchaser, and to the extent not otherwise prohibited by applicable Law, Sellers will permit Purchaser and its

Representatives to have, upon reasonable advance written notice, reasonable access to all premises, properties, books and records and Transferred Contracts included in the Acquired Assets during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of any Seller; provided, however, that, for avoidance of doubt, the foregoing shall not require any Person to waive, or take any action with the effect of waiving, its attorney-client privilege with respect thereto. Prior to the Closing, Purchaser shall not, and shall cause its Representatives not to, contact any employees, vendors, suppliers, landlords, or licensors of any Seller in connection with or pertaining to any subject matter of this Agreement except with the prior written consent of each Seller; provided, however, that so long as the applicable landlord for the applicable Store(s) is not a potential bidder at the Auction, Purchaser may contact the landlords for the Stores beginning one (1) day following the bid deadline for the Auction.

Section 5.7    Bulk Transfer Laws. Purchaser acknowledges that Sellers will not comply with the provisions of any bulk transfer laws or similar laws of any jurisdiction in connection with the transactions contemplated by this Agreement, including the United Nations Convention on the Sale of Goods, and hereby waives all claims related to the non-compliance therewith.

Section 5.8    Replacement Bonding Requirements.  On or prior to the Closing Date, Purchaser shall provide replacement guarantees, standby letters of credit or other assurances of payment with respect to all Bonding Requirements, in form and substance satisfactory to Sellers and any banks or other counterparty thereto, and, both prior to and following the Closing Date, Purchaser and Sellers shall cooperate to obtain a release in form and substance reasonably satisfactory to Purchaser and Sellers with respect to all Bonding Requirements. To the extent Purchaser is unable to make such arrangements with respect to any Bonding Requirements prior to the Closing, with Sellers' consent in lieu thereof, Purchaser shall deliver to Sellers an irrevocable, unconditional standby letter of credit in favor of Sellers in an amount equal to the amount of such Bonding Requirements, issued by a bank rated "A" or better by Standard and Poor's, in form and substance reasonably satisfactory to Sellers. To Sellers' Knowledge there are no Bonding Requirements with respect to the Transferred Contracts.

# ARTICLE VI
# OTHER COVENANTS

The Parties agree as follows with respect to the period from and after the Closing:

Section 6.1    Further Assurances. In case at any time after the Closing any further action is necessary to carry out the purposes of this Agreement, each of the Parties will, at the requesting Party's sole cost and expense, take such further action (including the execution and delivery of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation, providing materials and information) as the other Party may reasonably request which actions shall be reasonably necessary to transfer, convey or assign to Purchaser all of the Acquired Assets or to confirm Purchaser's assumption of the Assumed Liabilities.

Section 6.2    Access; Enforcement; Record Retention. From and after the Closing, upon request by any Seller, Purchaser will permit Sellers and their Representatives to have reasonable access during normal business hours, and in a manner so as not to interfere unreasonably with the normal business operations of Purchaser, to all premises, properties, personnel, books and records, and Contracts of or related to the Acquired Assets or the Assumed Liabilities for the purposes of (a) preparing Tax Returns, (b) monitoring or enforcing rights or obligations of any Seller under this Agreement or any of the Related Agreements, or (c) complying with the requirements of any Governmental Authority; provided, however, that, for avoidance of doubt, the foregoing shall not require Purchaser to take any such action if (i) such action may result in a waiver or breach of any attorney/client privilege, (ii) such action could reasonably be expected to result in violation of applicable law, or (iii) providing such access or information would be reasonably expected to be disruptive to its normal business operations. Purchaser agrees to maintain the files or records which are contemplated by the first sentence of this Section 6.2 in a manner consistent in all material respects with its document retention and destruction policies, as in effect from time to time, for six (6) years following the Closing.

Section 6.3    Employees, Labor Matters, etc.

(a)    Purchaser shall have no obligation to employ any of Sellers' employees, provided however, Sellers' employees may make applications for employment with Purchaser available to Sellers' employees, excluding Sellers' executives or insiders.

(b)    Except to the extent specifically provided in this Agreement and subject to the Bankruptcy Code and other applicable Laws, Sellers shall be responsible and liable for all amounts owed to any of its employees or former employees, including, without limitation, accrued wages, salaries, sick pay, vacation, compensation, bonuses or other benefits or payments on account of termination. Purchaser shall not assume or accept any obligation or liability under any Employee Benefit Plan or compensation arrangement of Sellers.

(c)    Sellers shall be solely responsible for any and all liabilities, penalties, fines or other sanctions that may be assessed or otherwise due under the WARN Act and similar laws and regulations, if applicable, on account of the dismissal or termination of any of the employees of Sellers by them on or prior to the Closing Date.

(d)    Purchaser shall have the right, subject to applicable Laws, to review and inspect Sellers' employee files and records, and, upon request, interview employees of Sellers, in order for Purchaser to evaluate each and every employee for possible hiring and employment, in Purchaser's absolute and sole discretion. Purchaser intends to offer employment to Sellers' employees, in the Purchaser's discretion. To the extent that Purchaser offers employment to any employee of any Seller and such employee accepts such employment, then, at the Closing or within ten (10) days thereafter, such Seller shall pay to such employee or to Purchaser all amounts owing by such Seller prior to the Closing with respect to such employees for accrued vacation time, sick pay time and other unpaid wages, salaries and other compensation.

25

(e)     Purchaser acknowledges that any and all decisions regarding which of the employees may be offered employment by Purchaser are solely those of Purchaser.

(f)     The obligations of Sellers and of Purchaser hereunder relating to Sellers' employees are for the sole benefit of either Sellers or Purchaser, and no inference should be drawn that any employee is a beneficiary of any of the terms, provisions and obligations hereunder; and the ability to enforce the obligations of Sellers and/or Purchaser hereunder with respect to such employees shall be the right of either Sellers or Purchaser, as applicable, but not any employee.

Section 6.4    Certain Tax Matters.

(a)     Transfer Taxes. Sellers shall pay any and all stamp, documentary, filing, recording, registration, use, transfer, added-value or other non-income Tax, fee or governmental charge imposed under applicable Law in connection with the transactions contemplated hereby (a "Transfer Tax"), other than sales taxes, if any.  The party that is required by applicable Law to file any Tax Returns in connection with Transfer Taxes described in the immediately preceding sentence shall, subject to Section 2.8, prepare and timely file such Tax Returns. Purchaser shall be entitled to receive such Tax Returns and other documentation reasonably in advance of filing by the applicable Seller, but not less than ten (10) Business Days prior to the due date of such Tax Returns, and such Tax Returns and other documentation shall be subject to Purchaser's approval, which shall not be unreasonably withheld, delayed, or conditioned. Purchaser and Sellers shall cooperate in making, in a timely manner, all Tax Returns, filings, reports, forms and other documentation as are necessary or appropriate to comply with all applicable Laws in connection with the payment of Transfer Taxes and shall cooperate in good faith to minimize, to the fullest extent possible under such Laws, the amount of any such Transfer Taxes.

(b)     Tax Adjustments. Taxes (other than Transfer Taxes) imposed upon or assessed directly against the Acquired Assets (including real estate Taxes (other than those subsumed in Section 2.8), personal property Taxes and similar Taxes) for the Tax period in which the Closing occurs (the "Proration Period") will be apportioned and prorated between Sellers and Purchaser as of the Closing Date with Purchaser bearing the expense of Purchaser's proportionate share of such Taxes which shall be equal to the product obtained by multiplying (i) a fraction, the numerator being the amount of the Taxes and the denominator being the total number of days in the Proration Period, times (ii) the number of days in the Proration Period following the Closing Date, and Sellers shall bear the remaining portion of such Taxes. If the precise amount of any such Tax cannot be ascertained on the Closing Date, apportionment and proration shall be computed on the basis of the amount payable for each respective item during the Tax period immediately preceding the Proration Period and any proration shall be adjusted thereafter on the basis of the actual charges for such items in the Proration Period. When the actual amounts become known, such proration shall be recalculated by Purchaser and Sellers, and Purchaser or Sellers, as the case may be, promptly (but not later than ten (10) days after notice of payment due and delivery of reasonable supporting documentation with respect to such amounts) shall make any additional payment or refund so that the correct prorated

26

amount is paid by each of Purchaser and Sellers.

(c)     Tax Refunds. In furtherance of Sellers' right to retain those assets described in section (a)(C) of the definition of Excluded Assets, Sellers shall be entitled to receive from Purchaser all refunds (or credits for overpayments) of Taxes, including any interest paid thereon, by a Governmental Authority, attributable to any tax period ending on or prior to the Closing Date (a "Pre-Closing Period") or the portion of any Proration Period ending on and including the Closing Date, net of any costs, fees, expenses or Taxes incurred in obtaining such refunds (or credits). Purchaser and Sellers shall execute all documents, take reasonable additional actions and otherwise reasonably cooperate as may be necessary to obtain the Tax refunds (or credits) contemplated by this Section 6.4(c). Purchaser shall pay any such Tax refund (or the amount of any such credit) to the Sellers within five (5) calendar days after Purchaser receives such Tax refund from a Governmental Authority or files a Tax Return claiming such credit.

Section 6.5     Insurance Matters. Purchaser acknowledges that, upon Closing, all insurance coverage provided in relation to Sellers, the Stores, or the Acquired Assets that is maintained by any Seller or its Affiliates (whether such policies are maintained with third party insurers or with such Seller or its Affiliates) shall cease to provide any coverage to Purchaser, the Stores, or the Acquired Assets and no further coverage shall be available to Purchaser, the Stores, or the Acquired Assets under any such policies.

Section 6.6     Acknowledgements.

(a)     Purchaser acknowledges that it has received from Sellers certain projections, forecasts, and prospective or third party information relating to Sellers, the Stores, the Acquired Assets, the Assumed Liabilities, and other related topics. Purchaser acknowledges that (i) there are uncertainties inherent in attempting to make such projections and forecasts and in such information; (ii) Purchaser is familiar with such uncertainties and is taking full responsibility for making its own evaluation of the adequacy and accuracy of all projections, forecasts, and information so furnished; and (iii) neither Purchaser nor any other Person shall have any claim against any Seller or any of its respective directors, officers, Affiliates, agents, or other Representatives with respect thereto. Accordingly, without limiting the generality of Section 3.11 or Section 9.1, Purchaser acknowledges that neither Sellers nor any other Person makes any representations or warranties with respect to such projections, forecasts, or information.

(b)     Purchaser acknowledges that, except for the representations and warranties expressly set forth in Article III (which representations and warranties shall terminate and be of no further force or effect as of the Closing), and without limiting the generality of Section 3.11, neither Sellers nor any other Person makes any representation or warranty, express or implied, including as to the accuracy or completeness of any information regarding any Seller, the Stores, any Acquired Assets, any Assumed Liabilities or any other matter, and neither Sellers nor any other Person will be subject to any Liability to Purchaser or any other Person resulting from such matters or the distribution to Purchaser, or the use of, any such information. Purchaser acknowledges that, should the Closing occur,

27

Purchaser will acquire the Acquired Assets and assume the Assumed Liabilities in an "as is" condition and on a "where is" basis, without any representation or warranty of any kind, express or implied (including any with respect to environmental, health or safety matters). Further, without limiting any representation, warranty, or covenant of any Seller expressly set forth herein, Purchaser acknowledges that it has waived and hereby waives as a condition to the Closing any further due diligence reviews, inspections, or examinations with respect to any Seller, the Stores, the Acquired Assets, the Assumed Liabilities, or any other matter, including with respect to engineering, environmental, title, survey, financial, operational, regulatory, and legal compliance matters.

Section 6.7    <u>Press Releases and Public Announcements</u>.  No Party shall issue any press release or make any public announcement relating to the existence or subject matter of this Agreement without the prior written approval of the other Parties, unless a press release or public announcement is required by applicable Law or a Decree of the Bankruptcy Court. If any such announcement or other disclosure is required by applicable Law or a Decree of the Bankruptcy Court, the disclosing Party shall give the nondisclosing Parties prior notice of, and an opportunity to comment on, the proposed disclosure. The Parties acknowledge that Sellers shall file this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order.

Section 6.8    <u>Licenses</u>.  With respect to any license to which any Seller is a party to related to any part of the space covered by the Leases, such Seller shall use commercially reasonable efforts to either terminate such license and/or reject such license under the Bankruptcy Code, excluding for the avoidance of doubt, any unexpired leases of real property under which a Seller is the lessor that is governed by section 365(h)(1)(A) of the Bankruptcy Code.

## ARTICLE VII
## CONDITIONS TO OBLIGATION TO CLOSE

Section 7.1    <u>Conditions to Purchaser's Obligations</u>. Purchaser's obligation to consummate the transactions contemplated hereby in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(a)    the representations and warranties set forth in <u>Article III</u> shall have been true and correct on the date hereof and as of the Closing (except to the extent expressly made as of an earlier specific date, in which case as of such date as if made at and as of such date), except where the failure of such representations and warranties to be so true and correct (without giving effect to any limitation as to "material" or "Material Adverse Effect" set forth therein) has not resulted in a Material Adverse Effect;

(b)    Sellers shall have performed and complied with its covenants and agreements hereunder through the Closing in all material respects;

(c)    in accordance with the Bidding Procedures Order, the Bankruptcy Court shall have entered (i) the Sale Order and (ii) any other order necessary to close the sale of the Acquired Assets, and no order staying, reversing, modifying, or amending such orders shall be in effect on the Closing Date;

28

(d)    no material Decree shall be in effect that prohibits consummation of the transactions contemplated by this Agreement; and

(e)    each delivery contemplated by Section 2.6(b) to be delivered to Purchaser shall have been delivered.

Section 7.2    Conditions to Sellers' Obligations. Sellers' obligations to consummate the transactions contemplated hereby in connection with the Closing are subject to satisfaction or waiver of the following conditions:

(a)    the representations and warranties set forth in Article IV shall have been true and correct in all material respects (except that any representation or warranty that is qualified by materiality shall have been true and correct in all respects) on the date hereof and as of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date as if made at and as of such date);

(b)    Purchaser shall have performed and complied with its covenants and agreements hereunder through the Closing in all material respects;

(c)    the Bankruptcy Court shall have entered (i) the Sale Order and (ii) any other order necessary to close the sale of the Acquired Assets, and no order staying, reversing, modifying, or amending such orders shall be in effect on the Closing Date;

(d)    no material Decree shall be in effect that prohibits consummation of any of the transactions contemplated by this Agreement; and

(e)    each payment contemplated by Section 2.6(a) to be made to Sellers shall have been made, and each delivery contemplated by Section 2.6(c) to be delivered to Sellers shall have been delivered.

Section 7.3    No Frustration of Closing Conditions. Neither Purchaser nor Sellers may rely on the failure of any condition to their respective obligations to consummate the transactions contemplated hereby set forth in Section 7.1 or Section 7.2, as the case may be, to be satisfied if such failure was caused by such Party's or its Affiliates' failure to use its reasonable best efforts (or commercially reasonable efforts, with respect to those matters contemplated by Section 5.3, respectively, as applicable) to satisfy the conditions to the consummation of the transactions contemplated hereby or by any other breach of a representation, warranty, or covenant hereunder.

## ARTICLE VIII
## TERMINATION

Section 8.1    Termination of Agreement. The Parties may terminate this Agreement at any time prior to the Closing as provided below:

(a)    by the mutual written consent of the Parties;

(b)    by any Party by giving written notice to the other Parties if any court of competent jurisdiction or other competent Governmental Authority shall have enacted or issued a Law or Decree or taken any other action permanently restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement and such Law or Decree or other action shall have become final and non-appealable;

(c)    by Purchaser by giving notice to each Seller if the Closing has not occurred prior to December 15, 2018 (the "Outside Date");

(d)    by Purchaser by giving notice to each Seller if the Bankruptcy Court has not entered the Bidding Procedures Order on or before October 9, 2018 or the Bidding Procedures Order has been entered but is stayed, withdrawn, or rescinded as of such date;

(e)    by Purchaser giving notice to each Seller if the Bankruptcy Court has not entered the Sale Order on or before December 15, 2018;

(f)    by Purchaser by giving notice to each Seller if the Bankruptcy Court does not approve the Breakup Fee and Expense Reimbursement;

(g)    by Purchaser by giving notice to each Seller if an order has been entered dismissing the Bankruptcy Cases, converting the Bankruptcy Cases to Chapter 7 cases or if Sellers file a motion or other pleading seeking the dismissal or conversion of the Bankruptcy Cases under Section 1112 of the Bankruptcy Code or otherwise;

(h)    by Purchaser by giving notice to each Seller at any time after the appointment of a Chapter 7 trustee or an examiner with expanded powers in the Bankruptcy Cases;

(i)    by Purchaser by giving notice to each Seller in the event the Bankruptcy Court grants relief from the automatic stay to any party to permit foreclosure or the exercise of other remedies on any material Acquired Assets of the Sellers;

(j)    by Purchaser by giving notice to each Seller in the event that the Sellers modify, alter or amend this Agreement without the consent of Purchaser, or in the event that the Sellers consent to any such modification, alteration or amendment;

(k)    by Purchaser by giving notice to each Seller if an event of default under the DIP Financing Facility has occurred and has not been cured or waived in accordance with the terms of the DIP Financing Facility documents;

(l)    by Purchaser by giving written notice to each Seller if there has been a material breach by any Seller of any representation, warranty, covenant, or agreement contained in this Agreement that has prevented the satisfaction of the conditions to the

obligations of Purchaser at Closing set forth in Section 7.1(a) and Section 7.1(b), and such breach has not been waived by Purchaser, or, if such breach is curable, cured by such Seller prior to the earlier to occur of (A) ten (10) days after receipt of Purchaser's notice of intent to terminate or (B) the Outside Date;

(m)    by any Seller by giving written notice to Purchaser and the other Sellers if there has been a material breach by Purchaser of any representation, warranty, covenant, or agreement contained in this Agreement that has prevented the satisfaction of the conditions to the obligations of Sellers at Closing set forth in Section 7.2(a) and Section 7.2(b), and such breach has not been waived by such Seller, or, if such breach is curable, cured by Purchaser prior to the earlier to occur of (A) ten (10) days after receipt of such Seller's notice of intent to terminate or (B) the Outside Date;

(n)    by Sellers or Purchaser with respect to any of the Stores (and the Acquired Assets related thereto), if (x) Sellers enter into a definitive agreement with respect to a Competing Bid with respect to the applicable Store(s), (y) the Bankruptcy Court enters an order approving a Competing Bid with respect to such Store(s) and (z) the Person making such Competing Bid consummates such Competing Bid, subject to Purchaser's right to payment of the Breakup Fee and Expense Reimbursement, if applicable, in accordance with the provisions of Section 2.4; or

(o)    by Sellers or Purchaser, if the Bankruptcy Court enters an order that precludes the consummation of the transactions contemplated hereby on the terms and conditions set forth in this Agreement.

Section 8.2    Effect of Termination. If any Party terminates this Agreement pursuant to Section 8.1, all rights and obligations of the Parties hereunder shall terminate upon such termination and shall become null and void (except that Article I, Section 3.11, Section 6.6, Section 8.3, Article IX, and this Section 8.2 shall survive any such termination) and no Party shall have any Liability (except as set forth in Section 2.4 and Section 8.3) to the other Party hereunder; provided, however, that nothing in this Section 8.2 shall relieve any Party from Liability for any breach occurring prior to any such termination (but solely to the extent such breach was willful, grossly negligent, or fraudulent) set forth in this Agreement; provided, further, that other than in the case of fraud or willful misconduct, that (a) the maximum Liability of Sellers under this Agreement shall not exceed the Breakup Fee and Expense Reimbursement and (b) the maximum liability of Purchaser under this Agreement shall not exceed the amount of the Deposit.

Section 8.3    Lease Indemnity. If this Agreement is terminated pursuant to Section 8.1(m), Purchaser shall indemnify Sellers for all Liabilities and Damages arising out of any Lease assumed by Sellers pursuant to section 365(k) of the Bankruptcy Code.

# ARTICLE IX
# MISCELLANEOUS

Section 9.1    Survival. Except for any covenant that by its terms is to be performed (in whole or in part) by any Party following the Closing, none of the representations,

warranties, or covenants of any Party set forth in this Agreement or in any certificate delivered pursuant to Section 2.6(b) or Section 2.6(c) shall survive, and each of the same shall terminate and be of no further force or effect as of, the Closing.

Section 9.2    Expenses. Except as otherwise expressly set forth herein, each Party will bear its own costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby, including all fees of law firms, commercial banks, investment banks, accountants, public relations firms, experts and consultants. For the avoidance of doubt, Purchaser shall pay all recording fees arising from the transfer of the Acquired Assets.

Section 9.3    Entire Agreement.    This Agreement, the Related Agreements and the Confidentiality Agreement constitute the entire agreement between the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or between the Parties to the extent they relate in any way to the subject matter hereof.

Section 9.4    Incorporation of Exhibits and Disclosure Schedule.    The Exhibits to this Agreement and the Disclosure Schedule are incorporated herein by reference and made a part hereof.

Section 9.5    Amendments and Waivers.    No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement. No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant. No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain, or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 9.5 except as expressly provided herein. Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

Section 9.6    Succession and Assignment. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of the other Parties. Notwithstanding the preceding, prior to Closing and only upon the advance written notice to Sellers, Purchaser may assign its rights under this Agreement with respect to the Stores and Leases to one or more Affiliates of Purchaser; provided, that any such assignment pursuant to this Section 9.6 shall not relieve Purchaser of any Liability or any of its obligations hereunder.

Section 9.7    Notices. All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein. Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (a) when

delivered personally to the recipient; (b) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); (c) upon receipt of confirmation of receipt if sent by facsimile transmission; (d) on the day such communication was sent by e-mail; or (e) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

|  |  |
|---|---|
| If to any Sellers: | Seasons Corporate LLC |
|  | c/o Getzler Henrich & Associates LLC |
|  | 295 Madison Avenue |
|  | 20th Floor |
|  | New York, NY 10017 |
|  | Telephone: 212-697-2400 ext. 20 |
|  | Facsimile: 212-697-4812 |

With a copy (which shall not constitute notice to Sellers)

to: Zeichner Ellman & Krause LLP
1211 Avenue of the Americas, 40th Floor
New York, New York 10036
Attention: Nathan Schwed
Facsimile: (212) 753-0396
Email: nschwed@zeklaw.com

|  |  |
|---|---|
| If to Purchaser: | SKNY LLC |
|  | 200 Public Square, Suite 2500 |
|  | Cleveland, OH 44114 |
|  | Attention: Mitchell Wolf |
|  | Telephone: (216) 738-3040 |
|  | Facisimile: (216) 738-3050 |

With a copy (which shall not constitute notice to Purchaser) to:

Klestadt Winters Jureller Southard & Stevens, LLP
200 West 41st Street, 17th Floor
New York, New York 10036
Attention: Tracy L. Klestadt
Facsimile: (212) 972-2245
Email: tklestadt@klestadt.com

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Parties notice in the manner set forth in this Section 9.7.

Section 9.8    Governing Law. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York (without giving effect to the principles of conflict of Laws thereof), except to the extent that the Laws of such state are

superseded by the Bankruptcy Code.

Section 9.9    Submission to Jurisdiction; Service of Process. Each of the Parties irrevocably and unconditionally submits to the exclusive jurisdiction of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby and agrees that all claims in respect of such Litigation may be heard and determined in any such court. Each Party also agrees not to (a) attempt to deny or defeat such exclusive jurisdiction by motion or other request for leave from the Bankruptcy Court or (b) bring any action or proceeding arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby in any other court. Each of the Parties irrevocably and unconditionally waives any objection to the laying of venue in, and any defense of inconvenient forum to the maintenance of, any Litigation so brought and waives any bond, surety or other security that might be required of any other Party with respect thereto. Any Party may make service on any other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in Section 9.7; provided, however, that nothing in this Section 9.9 shall affect the right of any Party to serve legal process in any other manner permitted by law or in equity. Each Party agrees that a final judgment in any Litigation so brought shall be conclusive and may be enforced by Litigation or in any other manner provided by law or in equity. The Parties intend that all foreign jurisdictions will enforce any Decree of the Bankruptcy Court in any Litigation arising out of or relating to this Agreement or any Related Agreement or the transactions contemplated hereby or thereby.

Section 9.10    Waiver of Jury Trial. EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

Section 9.11    Specific Performance. Purchaser acknowledges and agrees that Sellers and their respective estates would be damaged irreparably in the event Purchaser does not perform its obligations under this Agreement in accordance with its specific terms or otherwise breaches this Agreement, so that, in addition to any other remedy that Sellers may have under law or equity, each Seller shall be entitled, without the requirement of posting a bond or other security, to injunctive relief to prevent any breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof.

Section 9.12    Severability. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement. In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

Section 9.13    No Third Party Beneficiaries. This Agreement shall not confer any rights or remedies upon any Person other than Purchaser, each Seller, and their respective successors and permitted assigns.

Section 9.14 <u>Non-Recourse</u>. All claims or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or related in any manner to this Agreement or the Related Agreements may be made only against (and are expressly limited to) the Persons that are expressly identified as parties hereto or thereto (the "<u>Contracting Parties</u>"). In no event shall any Contracting Party have any shared or vicarious Liability for the actions or omissions of any other Person. No Person who is not a Contracting Party, including any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney or representative of, and any financial advisor or lender to, any of the foregoing ("<u>Non-Party Affiliates</u>"), shall have any Liability (whether in contract or in tort, in law or in equity, or granted by statute or based upon any theory that seeks to impose Liability of an entity party against its owners or affiliates) for any claims, causes of action, obligations or Liabilities arising under, out of, in connection with or related in any manner to this Agreement or the Related Agreements or based on, in respect of, or by reason of this Agreement or the Related Agreements or their negotiation, execution, performance or breach; and, to the maximum extent permitted by Law, each Contracting Party waives and releases all such Liabilities, claims and obligations against any such Non-Party Affiliates. Without limiting the foregoing, to the maximum extent permitted by Law, (a) each Contracting Party hereby waives and releases any and all rights, claims, demands, or causes of action that may otherwise be available at law or in equity, or granted by statute, to avoid or disregard the entity form of a Contracting Party or otherwise impose Liability of a Contracting Party on any Non-Party Affiliate, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise; and (b) each Contracting Party disclaims any reliance upon any Non-Party Affiliates with respect to the performance of this Agreement or the Related Agreements or any representation or warranty made in, in connection with, or as an inducement to this Agreement or the Related Agreements. The Parties acknowledge and agree that the Non-Party Affiliates are intended third-party beneficiaries of this <u>Section 9.14</u>.

Section 9.15 <u>Mutual Drafting</u>. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 9.16 <u>Disclosure Schedule</u>. All capitalized terms not defined in the Disclosure Schedule shall have the meanings ascribed to them in this Agreement. The representations and warranties of Sellers in this Agreement are made and given, and the covenants are agreed to, subject to the disclosures and exceptions set forth in the Disclosure Schedule. The disclosure of any matter in any section of the Disclosure Schedule shall be deemed to be a disclosure for all purposes of this Agreement and all other sections of the Disclosure Schedule to which such matter relates. The listing of any matter shall expressly not be deemed to constitute an admission by Sellers, or to otherwise imply, that any such matter is material, is required to be disclosed under this Agreement or falls within relevant minimum thresholds or materiality standards set forth in this Agreement. No disclosure in the Disclosure Schedule relating to any possible breach or violation of any Contract or law shall be construed as an admission or indication

that any such breach or violation exists or has actually occurred. In no event shall the listing of any matter in the Disclosure Schedule be deemed or interpreted to expand the scope of Sellers' representations, warranties, or covenants set forth in this Agreement. All attachments to the Disclosure Schedule are incorporated by reference into the applicable section of the Disclosure Schedule in which they are directly or indirectly referenced. The information contained in the Disclosure Schedule is in all respects provided subject to the Confidentiality Agreement.

Section 9.17    <u>Headings; Table of Contents</u>.  The section headings and the table of contents contained in this Agreement and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 9.18    <u>Counterparts; Facsimile and Electronic Signatures</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by facsimile copies or delivered by electronic communications by portable document format (.pdf), each of which shall be deemed an original.

Section 9.19    <u>Limitations Under Applicable Law</u>.  Notwithstanding anything to the contrary contained in this Agreement, Sellers' obligations hereunder shall be subject to limitations under applicable Law.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

BLUE GOLD EQUITIES LLC

By: _____

Title: CRO

CENTRAL AVE. MARKET LLC

By: _____

Title: CRO

AMSTERDAM AVE. MARKET LLC

By: _____

Title: CRO

WILMOT ROAD MARKET, LLC

By: _____

Title: CRO

SEASONS EXPRESS INWOOD LLC

By: _____

Title: CRO

SEASONS EXPRESS LAKEWOOD LLC

By: _____

Title: CFO

SEASONS MARYLAND LLC

By: _____

Title: CFO

SEASONS CLIFTON LLC

By: _____

Title: CFO

SEASONS CLEVELAND LLC

By: _____

Title: CFO

LAWRENCE SUPERMARKET LLC

By: _____

Title: CFO

UPPER WEST SIDE MARKET LLC

By: _____

Title: CEO

SEASONS CORPORATE LLC

By: _____

Title: CEO

SKNY LLC

By: _____

Title:

UPPER WEST SIDE MARKET LLC

By: _____

Title:


SEASONS CORPORATE LLC

By: _____

Title:


SKNY LLC

By: _____

Title: Authorized Signatory

**<u>Schedule 1.1(a)</u>** – Transferred Contracts

**TO BE SUPPLIED LATER**

## <u>Schedule 1.1(b) – Prepaid Expenses</u>

**TO BE SUPPLIED LATER**

**Schedule 1.1(c)** – **Seller Marks**

**TO BE SUPPLIED LATER**

**Schedule 1.1(d)  - Furnishings and Equipment (Leased)**

**TO BE SUPPLIED LATER**

**Schedule 1.1(e)  - Other Leased Equipment**

**TO BE SUPPLIED LATER**

**Schedule 1.1 (f) – Furnishings and Equipment (Owned)**

**TO BE SUPPLIED LATER**

**Schedule 1.1(g) – Inventory**

**TO BE SUPPLIED LATER**

**Disclosure Schedule**

**TO BE SUPPLIED LATER**

**Exhibits**

**TO BE SUPPLIED LATER**

**A – Bill of Sale**

**TO BE SUPPLIED LATER**

**B – Assignment & Assumption Agreement**

**TO BE SUPPLIED LATER**

**C – Sale Order Form**

**TO BE SUPPLIED LATER**

**D – Bidding Procedures**

**TO BE SUPPLIED LATER**