Hearing Date and Time:  September 17, 2018 at 2:00 p.m. (EST)

Robert M. Novick
Michele L. Angell
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700

*Counsel for L&N Consulting Group, LLC and Super Sol, LTD*

**UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>Blue Gold Equities LLC, *et al.*,[1]<br><br>　　　　　　　　　Debtors. | Chapter 11<br><br>Case No. 18-45280 (NHL)<br><br>(Joint Administration Motion Pending) |

**OBJECTION AND RESERVATION OF RIGHTS OF SUPERSOL CREDITORS TO DEBTORS' EMERGENCY MOTION PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363 AND 364 FOR INTERIM AND FINAL ORDERS AUTHORIZING DEBTORS (I) TO OBTAIN POST-PETITION FINANCING AND TO GRANT SUPERPRIORITY LIENS AND CLAIMS PURSUANT TO 11 U.S.C. §364(c) AND (d); (II) TO UTILIZE CASH COLLATERAL AND GRANT ADEQUATE PROTECTION TO PREPETITION SECURE CREDITORS; (III) MODIFYING THE AUTOMATIC STAY; (IV) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c) AND (V) GRANTING RELATED RELIEF**"

　　　　L&N Consulting Group, LLC ("L&N") and Super Sol, LTD ("Supersol," and together

with L&N, "Supersol Creditors"), as and for their initial objection to the *Debtors' Emergency*

*Motion Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364 for Interim and Final Orders*

*Authorizing Debtors (i) to Obtain Post-Petition Financing and to Grant Superpriority Liens and*

*Claims Pursuant to 11 U.S.C. §364(c) and (d); (ii) to Utilize Cash Collateral and Grant*

*Adequate Protection to Prepetition Secure Creditors; (iii) Modifying the Automatic Stay; (iv)*

---

[1]　Debtors' proposed caption.

*Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c) and (v) Granting Related Relief* [Docket No. 10] (the "Financing Motion"), and their reservation of rights with respect thereto, represent as follows:

## BACKGROUND

A.   The Supersol Indebtedness.

1.   The Supersol creditors hold an unsatisfied judgment (the "Judgment"), entered jointly and severally against certain of the Debtors and others, by the Supreme Court of New York, New York County, on May 1, 2018, in the case captioned *L&N Consulting Grp., LLC, et al. v. Bloom, et al.*, Index No. 650632/2018 (the "State Court Case"). (State Court Case Doc. No. 57.)  Pursuant to CPLR § 7510, the Judgment confirms an arbitration award issued by the Beth Din of America on August 2, 2017, as modified on January 10, 2018, in favor of L&N in the amount of $8,325,328.96, and Supersol in the amount of $31,578.95, excluding subsequent statutory interest (the "Supersol Indebtedness"). *Id*.  The judgment debtors are Debtors Blue Gold Equities LLC, Central Ave. Market LLC, Lawrence Supermarket LLC, Amsterdam Ave. Market LLC, Upper West Side Market LLC, and Scarsdale Supermarket LLC (the "Supersol Debtors"), as well non-debtors Zvi Bloom and Mayer Gold.   Pursuant to the Rooker-Feldman doctrine, the Court does not have jurisdiction to review the Judgment or reconsider the Supersol Indebtedness that has been reduced to the Judgment.

2.   The Supersol Indebtedness arose from certain Debtors', and Messrs. Bloom and Gold's, purchase of four profitable and formerly Supersol-branded stores located in Manhattan, Scarsdale, Queens and Lawrence, New York, which the Debtors operate under the Seasons name ("Seasons").  Seasons used the profits generated by these stores, and incurred mountains of additional debt (sometime in violation of obligations to other creditors), to finance an ineptly executed expansion into other geographic areas, rather than pay the balance of the purchase price

due to the Supersol Creditors. There are thus, in effect, two silos of Seasons stores: those purchased from the Supersol Creditors, and those that may have been the beneficiaries of fraudulent transfers from, or obligations incurred by, Debtors that own the former Supersol stores. No payments have been made by the Supersol Debtors in respect of the Supersol Indebtedness for several years.[2]

B.  Seasons Chapter 7 Case Already Pending in the Southern District of New York.

3. On August 28, 2018, the Supersol Creditors, along with one of the Debtors' suppliers (together, the "Petitioning Creditors"), commenced an involuntary chapter 7 case against Debtor Wilmot Road Market, LLC ("Wilmot") by filing an involuntary petition (the "Involuntary Petition") in the United States Bankruptcy Court for the Southern District of New York (the "Southern District Bankruptcy Court"), Case No. 18-12575 (MKV) (Bankr. S.D.N.Y.) (the "Involuntary Case"). Wilmot owns and operates Seasons' Scarsdale store. Upon information and belief, the Debtors' management knowingly authorized a prepetition creditor to remove valuable and essential equipment from Wilmot's store in violation of the automatic stay.

4. On August 29, 2018, the Petitioning Creditors caused a summons and the Involuntary Petition to be served on Wilmot [Involuntary Case Docket Nos. 6-7]. Wilmot's time to contest the Involuntary Petition expires September 19, 2018. *See* Fed. R. Bankr. P. 1011(b). The Debtors filed voluntary chapter 11 petitions in this Court on Sunday, September 16, 2018 (the "Voluntary Petition Date"), including for Wilmot. Their filings do not explain why they

---

[2] The *Declaration of Joel Getzler Pursuant to Local Bankruptcy Rule 1007-4 and in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 4], refers, in the passive voice, to a $600,000 payment that "was received by" the Supersol Creditors. This payment was made by a non-Debtor third party in exchange for a subordinate interest in the Supersol Judgment and has no apparent relevance to the Debtors' cases or the first day motions.

3

commenced a second case for Wilmot, or why they multiplied and complicated proceedings by filing in a second court.

C.	The Financing Motion.

5.	The Debtors filed the Financing Motion late on September 16, 2018. Although it is less than clear, it appears that the Financing Motion seeks to borrow some $8.7 million, comprised of (in round numbers) an initial draw of $4 million, and a roll-up of SKNY's $3.25 million of alleged prepetition secured debt upon entry of an interim order, and $1.7 million more of financing for the anticipated remainder of the cases. SKNY is the Debtors' second-largest equity holder, and upon information and belief, its principals are long-standing personal friends of Mr. Bloom. SKNY purports to be the Debtors' senior secured creditor, although the Supersol Creditors believe that the security interests may have been given in violation of covenants contained in pre-existing loan agreements. And now SKNY also proposes to be the Debtors' DIP lender.

6.	The Financing Motion is expressly tied to a proposed sale of substantially all of the Debtors' assets to none other than SKNY, for $12 million before adjustments.[3] Failure to sell the Debtors' assets to SKNY, or so much of them as SKNY chooses to take, is a DIP loan default that shuts down funding of the case, even if a clearly higher and better offer is available. (*See*

---

[3] *See Debtors' Motion for Order Pursuant to Sections 105(a), 363, 365 and 503 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006: (A)(i) Establishing Bidding Procedures and Bid Protections in Connection with the Sale of Certain of the Assets of the Debtors, (ii) Approving the Form and Manner of Notices; (iii) Approving the Asset Purchase Agreement Subject to Higher and Better Offers and (iv) Setting a Sale Hearing Date; and (B)(i) Approving the Sale of Certain Assets of the Debtors Free and Clear of Liens, Claims and Encumbrances, (ii) Authorizing the Assumption and Assignment of Certain Unexpired Leases and Executory Contracts and (iii) Granting Related Relief* [Docket No. 12] (the "Sale Motion"). In accordance with this Court's Administrative Order No. 557, § 2(c), and this Court's Chambers Rule No. 20 incorporating that Order, the Supersol Creditors strongly object to this motion being heard on shortened notice, let alone at the "first day" hearing. If the United States Trustee intends to seek to form a committee in this case, as would appear to be appropriate, the Sale Motion should not be heard until after committee formation.

*DIP Loan and Security Agreement* [Docket No. 10-1] (the "DIP Agreement" or "DA"), §§ 9.1(e), (f), (i), (m), (n).) Thus, the Financing Motion **seeks post-petition borrowing amounting to nearly 75% of the putative liquidation value of the Debtors (if the sale motion is to be credited), with the vast majority of that to be incurred on an interim basis with virtually no notice to creditors, and with a large equity holder on all sides of the transaction**. Despite the existence of third parties who have expressed interest in financing the DIP and/or bidding for Seasons' business, the Debtors have designed a locked-up chapter 11 process that is designed primarily for the benefit of SKNY, an apparent insider holding only a fraction of Seasons' total indebtedness. Quite likely, a chapter 7 liquidation would offer higher value to more creditors than a chapter 11 process funded by a short-term DIP that amounts to 75% of the notional value of the Debtors' business.

7. Moreover, the Supersol Creditors believe that in the past several weeks or more SKNY may have commandeered management of the Debtors, and as such is an Insider within the meaning of section 101(31) of the Bankruptcy Code. Although the Supersol Creditors require discovery to substantiate their understanding, they believe that in the weeks before the Voluntary Petition Date, Seasons' chief executive was relegated to a figurehead role, and the Debtors' bankruptcy plans were determined by SKNY and professionals who were newly retained by Seasons at SKNY's direction in place of previous professionals. Evidence of such at present is uniquely in the possession of the Debtors and SKNY. Furthermore, the Supersol Creditors believe that a material portion of the proceeds of the $10 million of indebtedness Seasons incurred to Bank United was transferred to SKNY, and that the Debtors thus have not fully disclosed their dealings with SKNY.

8. All told, it is abundantly clear that material provisions of the DIP cannot be approved on an interim basis, if ever, and should be heard only upon full notice after (expedited) discovery; and no findings of fact with respect to the arms-length nature of the DIP or anyone's good faith, now whether the proposed DIP represents the highest or best financing terms available to the Debtors, should be entered at this time. If SKNY refuses to provide interim financing on any other basis than that offered in the Financing Motion, affiliates of the Supersol Creditors are prepared to offer up to $2 million of interim financing for a term of 35 days on the same seniority, and the same or better economic terms, as that offered by SKNY – without any prepetition roll-ups or ties to compulsory sale terms – to permit the Debtors an opportunity to seek more equitable financing for the remainder of the cases, or an opportunity for the cases to be converted to chapter 7 or for a chapter 11 trustee to be appointed.

**OBJECTIONS TO ENTRY OF PROPOSED INTERIM ORDER**

**A.     The Failure to Sell Seasons to SKNY Should Not Be a DIP Default.**

9. Section 9 of the DIP Agreement is an impermissible attempt to lock the Debtors into selling their assets to SKNY, and all but dooms a fair bidding process. (*See* DA §§ 9.1(e), (f), (i), (m), (n).)[4] For example, the DIP Agreement provides that terminating the APA with

---

[4]     The DIP Agreement impermissibly provides, in relevant part:

In addition to the Events of Default under the Interim DIP Order and/or Final DIP Order, the following shall constitute a Default:
    (e) An Event of Default (as defined in the APA) has occurred and is continuing under the APA; or
    (f) The filing of a Chapter 11 Plan for the Debtors does not provide for the consummation of the transactions contemplated by the APA or the payment in cash in full of the DIP Obligations on or before the Maturity Date; or . . . .
    (i) The APA is terminated for any reason other than a default of the Lender under the APA; or . . . .
    (m) The Bidding Procedures Order (as defined in the APA), which authorize the Lender to credit bid the Prepetition Indebtedness and the DIP Obligations pursuant to Sections 363(f) and 363(k), shall not have been entered by the Bankruptcy Court on or prior to October 9, 2018; or
    (n) The Sale Order approving the Sale to Lender shall not have been entered by the Bankruptcy Court on or prior to December 15, 2018 . . . .

SKNY *in order to sell to a higher bidder*, would constitute a DIP default, entitling SKNY to stop funding the cases so that the Debtors are unable to proceed to close on the higher offer. SKNY would also be entitled to collect default interest, effectively giving it a "double dip" on break-up fees if another bidder were chosen. (*See id., e.g.*, § 9.1(f), (i).) The DIP agreement also cross defaults with defaults under the APA, even though the APA has not received court approval and will not for many months, if ever. SKNY is transparently using the DIP to provide it with a veto of any sale other than a sale to itself – even one that pays SKNY in full – which is plainly unacceptable and will destroy value for all other stakeholders.

      **B.**      **The Court Should Not Enter Interim Findings Concerning  
             Non-Insider Status, Business Judgment or Good Faith**

10. Although courts ordinarily defer to a debtor's business judgment in selecting DIP financing, where the debtor's independent judgment has been compromised, its decision will be subject to the heightened "entire fairness" standard. *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011). "This requires proof of fair dealing and fair price and terms." *Id.* (rejecting proposed DIP financing where debtor, controlled by principal with personal liability to proposed lender, failed to negotiate in good faith); *see In re Ames Dep't Stores*, 115 B.R. 34, 39 (Bankr. S.D.N.Y. 1990) ("[A] proposed financing will not be approved where . . . the purpose of the financing is to benefit a creditor rather than the estate.").

11. Moreover, transactions between debtors and their insiders are, in general, subject to heightened scrutiny. *See In re Innkeepers USA Tr.*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010); *In re Family Christian, LLC*, 533 B.R. 600, 622, 627 (Bankr. W.D. Mich. 2015); *In re Bidermann Indus. U.S.A. Inc.*, 203 B.R. 547, 549, 551 (Bankr. S.D.N.Y. 1997) ("[T]he conduct of bankruptcy proceedings not only should be right but must seem right."). "Courts recognize two types of insiders—statutory and non-statutory." *Jacobs v. D'Alessandro (In re Dewey &*

*Leboeuf LLP)*, Nos. 12-12321 (MG), 14-01919 (MG), 2014 Bankr. LEXIS 4051, at *16-17 (Bankr. S.D.N.Y. Sept. 23, 2014).  A "person in control of the debtor" is its statutory insider.  11 U.S.C. §101(31)(B)(iii), (C)(v).  "The inquiry is fact-specific and can turn on a case-by-case basis from the totality of the circumstances."  *Dewey & Leboeuf*, 2014 Bankr. LEXIS 4051, at *17 (quotation and ellipses omitted).  Likewise, courts generally determine non-statutory insider status by examining the closeness of the relationship between the parties, the degree of control exerted over the debtor and whether transactions were conducted at arm's length.  *Id.* at *20 (quotation omitted).

12. The Debtors here, in their proposed interim order submitted with the Financing Motion [Docket No. 10-1, Ex. C] (the "Proposed Interim Order," cited as "Proposed Order"), ask the Court to find immediately, *inter alia*, that:  the terms of the DIP "reflect the Debtors' exercise of their prudent business judgment" and "have been negotiated in good faith and at arms' length"; "credit extended under the terms of the DIP Documents is being extended in good faith by the Lender"; SKNY "is also acting in good faith . . . in closing the transactions contemplated in the DIP Documents," including the APA; and that SKNY "is not an 'insider' or 'affiliate' of the Debtors (as such terms are defined in the Bankruptcy Code)."  (Proposed Order ¶ X; *see also id.* ¶ 23.)

13. The Court should reject all of these findings and defer consideration to the final DIP hearing.  In fact, while the Debtors and SKNY have been far from forthcoming, the limited information available suggests the exact opposite of good faith, arm's length negotiations: SKNY is a part owner of the Debtors; as a prepetition lender it tripled the amount of its indebtedness within six months of the bankruptcy (possibly in violation of the Debtors' loan covenants); SKNY may exercise undue control over the Debtors and their cases; and the DIP is a

transparent attempt to leverage a relatively small amount of prepetition indebtedness into further control of the cases and acquire the Debtors' business.  Importantly, entry of such findings could also tilt the playing field in favor of approval of the sale to SKNY.[5]

14.    Creditors should be granted time to conduct limited, expedited discovery to challenge purported good faith, non-insider status, or the Debtors' purported satisfaction of the entire fairness or business judgment standard, as applicable, rather than accept the Debtors' say-so.  The Court should therefore defer making such findings until the final DIP hearing, and after the appointment of any committee.

### C.    The Court Should Not Enter Interim Findings Concerning Lack of Credit Available on More Favorable Terms

15.    In seeking approval of the DIP, the Debtors bear "the burden of proving that: (1) [t]hey are unable to obtain unsecured credit per 11 U.S.C. § 364(b), i.e., by allowing a lender only an administrative claim per 11 U.S.C. 503(b)(1)(A); (2) [t]he credit transaction is necessary to preserve the assets of the estate; and (3) [t]he terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender." *L.A. Dodgers*, 457 B.R. at 312 (citations omitted).  Likewise, "[t]he first prong of 11 U.S.C. § 364(d) requires the debtor to show that alternate financing is unavailable." *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992).  Although "Section 364(d)(1) does not require the debtor to seek alternate financing from every possible lender . . . the debtor must make an effort to obtain credit without priming a senior lien." *Id.* at 630-31 (citing *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986)) (additional citation omitted) (emphasis added).

---

[5]    Notably, pursuant to this Court's Administrative Order No. 557 § 2(c), bid procedures require 14-21 days' minimum notice.

16. Recognizing this well-established law, the Debtors ask the Court to find, *inter alia*, that they: "are unable to obtain financing from sources other than [SKNY] on terms more favorable"; "have been unable to obtain sufficient unsecured credit"; and "have also been unable to obtain credit: (a) having priority over administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the Debtors and their Estates that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the Debtors that is subject to a lien that is on terms more favorable than the DIP Facility." (Proposed Order ¶ VI (b).)  The Court should decline to do so.

17. To be sure, the Supersol Creditors stand in the unique position of *knowing* that there is no basis for the foregoing findings, because they sought themselves to develop and advance their own DIP proposal for months, yet, the Debtors refused to engage with them or provide them basic diligence information like a proposed DIP budget or recent financials. Furthermore, the Debtors' counsel admitted to the Judgment Creditors' counsel on September 14, 2018, that at least one other party was interested in funding a DIP.  The Debtors have provided no disclosure as to what other offers were potentially available and from whom, nor what process they undertook to seek financing.  Since the Debtors had no legitimate reason to ignore the Supersol Creditors' overtures, presumably they were just as non-responsive to other third parties, such that any purported lack of alternative financing may have been entirely of the Debtors' own making.  *See L.A. Dodgers*, 457 B.R. at 314 (rejecting DIP proposal where: "Had Debtors negotiated with [alternate potential lender], a more economically viable loan may have developed.").

18. In all events, there is no basis for entering proposed findings at the present time that the Debtors "are unable to obtain financing from sources other than [SKNY] on terms more

favorable." The Court should reject these findings at this interim stage, until such time as creditors can conduct limited discovery into whether they are actually true.

        **D.**      **Additional Objections.**

19. Finally, in the abbreviated time the Supersol Creditors have had to review and consider the proposed DIP documents, they have identified the following additional concerns:

20. The Roll-Up. SKNY seeks, and the Debtors have agreed, to "roll up" $3.275 million of prepetition debt in exchange for offering, initially, $4 million of new money (in itself seeming too high), at the same time that they have agreed that a fair sale price for the Debtors is only $12 million. The roll-up transforms SKNY's alleged prepetition secured claims into administrative expenses that would have to be paid to confirm a plan, and requires the Debtors to pay post-petition interest on these pre-petition claims. The net effect is to create a wall off debt that can be credit-bid – from an equity holder that held only $1 million of indebtedness a short time ago - to discourage third party bidders. The Court therefore should defer consideration of the "Roll-Up" (Proposed Interim Order, ¶ 14(a)) until the final DIP hearing rather than tilting the sale process further in SKNY's favor on the first day of the cases.

21. The Challenge Period. The Debtors' proposed 30-day "Challenge Period" (as defined in the Proposed Interim Order) (Proposed Order ¶ 29) is unreasonably short and, in any event, directly violates Administrative Order No. 558 § 5(b), which provides that where no unsecured creditors committee ("UCC") has been appointed, the period to challenge the validity of prepetition liens must run "*at least* 75 days (*or a longer period* as the Court orders for cause shown before the expiration of such period) from the entry of the final financing order"

11

(emphasis added).[6]  A thirty-day challenge period would plainly be insufficient here because a UCC or challenging party would have to investigate SKNY's claims and liens and history dealing with the Debtors, move for and secure derivative standing to the extent necessary, and then interpose a motion or complaint.   It is improbable, if not impossible, for a party to accomplish all of this in the limited time sought by the Debtors and SKNY.  Given the complexity of SKNY's relationships to the Debtors, the Supersol Creditors propose a 90-day period from the later of entry of a final financing order or the appointment of a committee, subject to extension by the Court pursuant to Administrative Order No. 558 § 5.

22. <u>Fees and Expenses</u>.  The Proposed DIP Order, ¶ 3, provides for payment of fees and expenses, including attorneys' fees, of SKNY.  As discussed above, SKNY is wearing at least three additional hats – bidder for the Debtors' assets, prepetition creditor, and prepetition equity holder (plus, probably playing a management role as well).  To the extent the Financing Motion is approved, the approval order should provide that SKNY may only charge the estates for fees incurred in its role of DIP lender, and that SKNY must provide sufficiently detailed invoices for reviewing parties to determine that it is in compliance.  It would be inappropriate for one potential acquirer to be advantaged over others by receiving reimbursement of its legal fees from the estates, in addition to whatever expense reimbursements may eventually be authorized under a bid procedures order.

## RESERVATION OF RIGHTS WITH RESPECT TO FINAL ORDER

23. As projected above, the Supersol Creditors have serious concerns about whether the Debtors and SKNY negotiated the DIP at arm's length, and sought the best terms in the

---

[6]  *See also* Administrative Order No. 565, § 3(c) (mandating that first-day financing and cash collateral motions "be brought in accordance with this Court's 'Guidelines for Financing Motions' adopted pursuant to Administrative Order 558 dated April 15, 2010").

market. Relatedly, and of greater importance, the proposed DIP contains provisions that will chill bidding and lock the Debtors into a sale to SKNY. Indeed, the mere "message" projected by the Debtors in accepting and defending these terms is enough to dissuade third parties from undertaking the costs and efforts to attempt to compete with SKNY for the Debtors' assets, and depresses value. These concerns are exacerbated by the minimal financial information about the Debtors that has been made available. The Supersol Creditors intend to imminently serve the Debtors with limited discovery requests narrowly targeted at addressing these concerns, and during the coming weeks, to work with the Debtors and any UCC to help ensure that DIP financing is negotiated at arm's length and on the most favorable terms reasonably possible, and does not chill bidding for the Debtors' assets. The forgoing is not intended to comprise all of the Supersol Creditors' potential objections to entry of a final financing order, and they of course reserve all of their rights to object to the Debtors' final financing order on any grounds, whether or not raised herein.

Dated: September 17, 2018
      New York, New York

    KASOWITZ BENSON TORRES LLP

    By: /s/ Robert M. Novick
    Robert M. Novick (rnovick@kasowitz.com)
    Michele L. Angell (mangell@kasowitz.com)
    1633 Broadway
    New York, New York 10019
    Telephone: (212) 506-1700

    *Counsel for L&N Consulting Group, LLC and Super Sol, LTD*